589 So.2d 245 (1991)
Michael J. BEDFORD, Appellant,
v.
STATE of Florida, Appellee.
No. 73703.
Supreme Court of Florida.
October 10, 1991.
Rehearing Denied December 9, 1991.
*247 Richard L. Jorandby, Public Defender, and Gary Caldwell and Allen J. DeWeese, Asst. Public Defenders, West Palm Beach, for appellant.
Robert A. Butterworth, Atty. Gen., and James J. Carney, Asst. Atty. Gen., West Palm Beach, for appellee.
PER CURIAM.
Michael J. Bedford, a prisoner under sentence of death, appeals his convictions of first-degree murder and kidnapping and the sentences attendant thereto. We have jurisdiction, article V, section 3(b)(1), Florida Constitution, and affirm the convictions and sentence for kidnapping but vacate the sentence of death.
On January 3, 1988, Deborah Herdmann's nude body was found beside a dumpster behind a shopping center. Her hands were bound behind her back with duct tape. There was also duct tape over her mouth and around her neck. There were human feces on her hands.
The police identified Herdmann through an engraved class ring that was found on the body. The victim's family gave the police the name Vincent Walsh and a business card for Walsh's limousine service. On January 7, after several statements were taken from Walsh, Bedford was asked to come to the police station for questioning.
Bedford gave three conflicting statements to the police. The latter two statements were tape-recorded, the first was not. In the first statement, Bedford denied any involvement with Herdmann on the day of the murder.
In a second statement which was taped and played to the jury, Bedford admitted being in one of Walsh's limousines with Walsh and Herdmann on the day of the murder but maintained that Herdmann was still alive when he left them. He told police that on January 2 Walsh sent him to pick up Herdmann. After Bedford delivered Herdmann, Walsh and Herdmann left in the limousine alone. Bedford met them later at the mall. When he got into the limousine, he noticed Herdmann's hands were tied behind her and there was tape around her head "like a gag." Walsh told Bedford they had just had sex. Walsh also told Bedford that they were going to take Herdmann out somewhere and drop her off with no clothes, to scare her into leaving him alone. They drove around for a couple of hours, then stopped at a gas station where Walsh threw away Herdmann's purse and shoes. Bedford maintained that Herdmann was still alive when he was dropped off at the mall.
There was testimony that prior to the taping of the above statement, Bedford told police that he and Walsh had planned to kidnap Herdmann, bind her up, and leave her in the Everglades nude because she was constantly calling them. Their intent was to scare her so she would leave them alone. On Walsh's instructions, Bedford brought the duct tape when he went to pick up Herdmann and placed it under the front seat of the limousine.
In the third statement which was also taped and played to the jury, Bedford admitted that he was with Walsh when the body was dumped. Bedford stated that when he got into the limousine at the mall, he got into the back seat with Herdmann who was bound with the tape. There were feces on the carpet. Walsh was getting out of the back and told him that they had just had sex. They drove around and Herdmann asked if Walsh was going to kill *248 her. Bedford told her Walsh was just fooling around. Herdmann complained about the tape, so Bedford tried to loosen it. Finally, Herdmann began to act strange, fell to the floor, and started changing colors. Bedford told Walsh he thought she had broken her neck. Walsh stopped by a dumpster and dragged the body out of the car.
There was testimony that prior to the taping of the above version of events, Bedford told police that after asking if they were going to kill her, Herdmann began to struggle. When Bedford put his hands on her shoulders to subdue her, he heard her "neck snap." She fell limp to the floor and stopped breathing. They dumped the body as related in the taped statement. Bedford again stated that for two or three weeks prior to the incident, he and Walsh had been planning to frighten Herdmann by binding her up and taking her out to the Everglades and dumping her.
According to the medical examiner, seven to eight layers of tape were wrapped tightly around the victim's hands which were bound together behind her back. The victim's jewelry was underneath the tape. Tape was stretched tightly across her mouth. There were abrasions to the lips that, according to the medical examiner, were probably caused by the victim trying to scream or yell with the tape on her mouth. Two to three layers of tape were wrapped loosely around her neck and hair. The medical examiner explained that the tape around the neck would protect the neck from bruising if it were squeezed. There was no external evidence of trauma to the neck. However, an internal examination revealed a small area of internal hemorrhage on the left side of the neck extending behind the trachea into the esophagus. This internal injury was likely caused by a thumb or finger slipping off the tape and pressing against the neck. The injury to the neck occurred very near the time of death. The cause of death was asphyxia caused by either pressure to the neck restricting breathing or pressure to the vagus nerve stopping the heart, or a combination of the two. There were bruises on the victim's right shoulder and on her legs which were consistent with an injury occurring very shortly before death. There were three areas of bruises and contusions on the victim's scalp caused by trauma to the head which also occurred shortly before death. The victim had engaged in intercourse but there was no evidence of forcible rape.
The defense of accidental death during erotic sexual asphyxia was raised at trial through Bedford's testimony. According to his testimony, Walsh asked him to pick up Herdmann and bring her to his mother's house so Walsh could tell her to "lay off." Herdmann, who Bedford knew as Debbie Hernandez, had been harassing them by constantly calling Walsh and calling Bedford to find out about Walsh. The plan, which Bedford knew about a week before, was to scare Herdmann by taking her out and leaving her so that she would either have to walk back or call somebody to pick her up.
As instructed, Bedford took Herdmann to meet Walsh. Walsh and Herdmann got in Walsh's limousine. Bedford agreed to meet Walsh later at the mall. Bedford made several phone calls to Walsh from the mall while waiting. As Bedford came up to the limousine, Walsh was pulling up his pants. Walsh told Bedford to get in the back of the limousine. Herdmann was in the back. She was naked and was bound with the duct tape Bedford had left under the driver's seat for Walsh. Bedford assumed Walsh and Herdmann had engaged in anal sex because he saw feces on the floor.
Bedford described himself as a "go-between" for Herdmann and Walsh. He explained that during phone conversations with Herdmann, she would tell him about "kinky sex" with Walsh and others.
After Bedford got into the car, Herdmann asked that the tape be pulled down from around her earring. Bedford did as she asked. He said he also pulled the tape from her mouth down to her chin. After a while, Herdmann asked Walsh to stop the car, let Bedford drive and get in the back seat so Walsh could have sex with her. *249 When Walsh ignored her, she tried to make him jealous by having sex with Bedford. First, Bedford and Herdmann engaged in oral sex. Then they had intercourse. While they were having intercourse, Herdmann asked Bedford to put his hands around her throat and push on a point with his fingers to "get her off." They continued to have intercourse with Bedford pressing on her neck. After a couple of minutes, Bedford began to have an orgasm, at which time Herdmann fell to the floor. Bedford told Walsh he thought he had broken her neck. After checking for a pulse, Bedford asked Walsh to take Herdmann to a hospital. Walsh refused, saying if they took her tied up, no one would believe their story. They drove around until Walsh stopped by a dumpster. Walsh took the body out of the car and placed it by the dumpster. Bedford refused to help. As the body was pulled from the car Herdmann's head hit the car door and the concrete.
Bedford maintained that the death was an accident, that it was Herdmann's idea for him to hold on to her neck and press, that he did not know what erotic sexual asphyxia was, and that he did not intend to kill her or otherwise harm her. He said he did not call the police because he was scared and did not want anyone to know he had been "fooling around" with Herdmann.
Dr. Abdulla Fateh, a forensic pathologist who testified for the defense, testified that erotic sexual asphyxia is a phenomenon of abnormal sexual behavior in which pressure is applied to the neck that causes reduction in the blood supply to the brain, in turn causing sexual arousal and orgasm. Dr. Fateh testified that the cases he had personally seen involved single males and although it was possible for the phenomenon to occur between a couple engaging in sexual intercourse it is extremely unusual and uncommon. In Dr. Fateh's opinion, if two consenting adults were engaging in sexual intercourse and one depressed the carotid artery of the other to decrease the flow of blood to the brain, at the point of orgasm, an accidental death could occur. Dr. Fateh also found that the injuries to the victim's neck reported in the autopsy report were consistent with erotic sexual asphyxia. Dr. Fateh further testified that it is common for people engaging in this practice to cover the neck with some sort of material to avoid leaving marks. However, on cross-examination, Dr. Fateh testified that Herdmann's injuries were also consistent with death by strangulation. In Dr. Fateh's opinion, based on the reports and depositions he had reviewed, Herdmann died of asphyxia but the death was probably not related to erotic activity.
Bedford was found guilty, as charged, of first-degree murder and kidnapping. Finding three aggravating factors[1] and no mitigating factors, the trial court overrode the jury's recommendation of life imprisonment and sentenced Bedford to death. The court also sentenced Bedford to a consecutive life sentence without possibility of parole for the kidnapping.

GUILT PHASE
Bedford raises the following six challenges to his convictions: 1) the homicide jury instructions were incorrect; 2) the conviction for first-degree murder must be reversed because a) there is insufficient evidence of premeditation, b) there is insufficient evidence of the underlying felony for felony murder, and c) first-degree murder was improperly submitted to the jury on alternative theories of premeditation and felony murder; 3) the conviction for kidnapping must be reversed because a) there is insufficient evidence of confinement and intent, b) there was no evidence of corpus delicti, and c) the term "intent to terrorize" as used in the kidnapping statute is unconstitutionally vague and overbroad; 4) the trial court erred by allowing the State to attack the defense's contention that the victim voluntarily engaged in sexual intercourse at the time of her death with inadmissible *250 hearsay and with improper impeachment of a defense witness; 5) fundamental cumulative error occurred when the State was allowed to introduce inadmissible and prejudicial evidence and to make numerous inflammatory comments during closing argument; and 6) the jury instruction on kidnapping was improper.
We find no merit to Bedford's first claim that he is entitled to a new trial due to alleged improper jury instructions on homicide all of which were expressly approved by defense counsel. Bedford's first contention that the giving of the short-form standard jury instruction on excusable homicide is fundamental error has been previously rejected by this Court. Bruno v. State, 574 So.2d 76 (Fla.), petition for cert. filed (U.S. May 24, 1991) (No. 90-8124); State v. Schuck, 573 So.2d 335 (Fla. 1991); State v. Smith, 573 So.2d 306 (Fla. 1990). Likewise, we reject Bedford's claim that the alleged inadequate instruction on manslaughter resulted in fundamental error. See Rojas v. State, 552 So.2d 914, 916 n. 1 (Fla. 1989) (failure to give an accurate instruction on a lesser included offense which is two steps removed from the offense of which the defendant is convicted does not result in per se reversible error); State v. Abreau, 363 So.2d 1063 (Fla. 1978) (same). We also find no merit to Bedford's contention that the giving of the standard jury instructions resulted in fundamental error because the instructions did not adequately inform the jury that unlawfulness is an element of first-degree murder.
As his second and third claims, Bedford challenges the sufficiency of the evidence to support his convictions of first-degree murder and kidnapping. We find no merit to either of these claims. We have reviewed the record and find competent substantial evidence to support a kidnapping conviction and a first-degree murder conviction based on either this underlying felony or a finding of premeditation.
First, we address Bedford's contention that there is insufficient evidence to support a conviction of premeditated first-degree murder because the State's evidence is consistent with his story of an accidental death during erotic sexual asphyxia. Bedford correctly points out that although premeditation may be proven by circumstantial evidence, in order to prove a fact in this manner, the evidence must be inconsistent with any reasonable hypothesis of innocence. Wilson v. State, 493 So.2d 1019, 1021-22 (Fla. 1986); McArthur v. State, 351 So.2d 972 (Fla. 1977). Thus, where, as here, the State seeks to establish the element of premeditation though circumstantial evidence, the evidence must be inconsistent with every other inference that reasonably could be drawn from the evidence. Wilson v. State, 493 So.2d at 1022. However, the question of whether the evidence proves premeditation to the exclusion of all other reasonable inferences is a question of fact for the jury, whose verdict will not be reversed on appeal, where there is substantial competent evidence to support it. Holton v. State, 573 So.2d 284, 289 (Fla. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 2275, 114 L.Ed.2d 726 (Fla. 1991); Cochran v. State, 547 So.2d 928, 930 (Fla. 1989); State v. Law, 559 So.2d 187, 188 (Fla. 1989).
Our review of the record reveals that there was sufficient evidence from which the jury could have inferred premeditation to the exclusion of all other possible inferences, including an accidental death occurring during either erotic sexual activity or an attempt to subdue Herdmann. Herdmann's body was found with her hands bound tightly behind her back. Her mouth was taped shut. There was evidence that she had abrasions to the mouth likely caused from her attempts to scream through the tightly affixed tape, and that she had sustained injuries to the head and legs prior to her death. There was also testimony that Walsh and Bedford wanted Herdmann to stop bothering them.
The circumstantial evidence rule does not require the jury to believe the defendant's version of the facts when the State has produced conflicting evidence. Cochran v. State, 547 So.2d at 930. Because each of Bedford's several versions of events was inconsistent with the others, the jury reasonably could have concluded *251 that each of these accounts was untrue. Holton v. State, 573 So.2d at 290. There was also other evidence which contradicted Bedford's story of an accidental killing. Evidence that Herdmann's mouth was tightly taped when her body was found was inconsistent with Bedford's claim that he removed the tape prior to Herdmann asking him to squeeze her neck and that it remained off when her body was dumped. Evidence that Herdmann had several contusions to the head which occurred prior to her death was inconsistent with Bedford's claim that the injuries to the victim's head occurred when Walsh dumped the body. Finally, the medical examiner's testimony that the cause of death was asphyxiation resulting from a great deal of pressure to the neck was inconsistent with an accidental death resulting from a "snapped" neck while Bedford was trying to subdue the victim.
Because the State offered competent evidence that is inconsistent with Bedford's version of events and from which the jury reasonably could have excluded every hypothesis except that of premeditated murder, Bedford's motion for judgment of acquittal on that count was properly denied. State v. Law, 559 So.2d 187 (Fla. 1989).
We also find that there was sufficient evidence to support convictions of kidnapping and felony murder based on that underlying felony. Count II of the indictment alleged that Bedford unlawfully and forcibly, secretly, or by threat, confined, abducted or imprisoned Herdmann against her will and without lawful authority with the intent to inflict bodily harm upon or to terrorize her, in violation of section 787.01(1)(a), (3), Florida Statutes (1987).
First, we reject Bedford's claim that because there was evidence that Herdmann went willingly with the two men, the State failed to prove that she was forcibly, secretly, or by threat, abducted or confined against her will. There was testimony that Bedford admitted a plan to "kidnap" Herdmann and take her out to the Everglades and leave her. There was also evidence that while she was being transported to this destination, Herdmann asked if she was going to be killed and began to struggle. Her body was found bound and there was evidence that she sustained numerous injuries to her head and legs prior to her death. This evidence supports a finding that Herdmann was being forcibly abducted and confined against her will. Further, evidence that Herdmann was transported to the Everglades, an isolated area where there would be no possibility of meaningful contact with members of the public, was tantamount to "secretly" abducting and confining her. Robinson v. State, 462 So.2d 471 (Fla. 1st DCA 1984), review denied, 471 So.2d 44 (Fla. 1985). We also agree with the State that the evidence was sufficient to prove a specific intent to do bodily harm or to terrorize Herdmann under any definition of the latter term.
We also find no merit to Bedford's contention that a conviction for kidnapping cannot be sustained because any confinement was "merely incidental" to the homicide. Bedford was charged with confining, abducting, or imprisoning Herdmann with the intent to "[i]nflict bodily harm upon or to terrorize" Herdmann, under section 787.01(1)(a), (3), rather than with the intent to "[c]ommit or facilitate commission of any felony," under subsection 787.01(1)(a), (2). Our decision in Faison v. State, 426 So.2d 963 (Fla. 1983), which held that the latter subsection does not apply to unlawful confinements or movements that were merely incidental to or inherent in the nature of the underlying felony, has no application here.
We also reject Bedford's contention that his kidnapping conviction cannot be sustained because the State failed to establish the corpus delicti prior to admitting his statements. There was substantial evidence, independent of Bedford's statements, "tending to show" each element of the crime charged. See Thomas v. State, 531 So.2d 708, 711 (Fla. 1988); Justus v. State, 438 So.2d 358, 367 (Fla. 1983), cert. denied, 465 U.S. 1052, 104 S.Ct. 1332, 79 L.Ed.2d 726 (1984); State v. Allen, 335 So.2d 823 (Fla. 1976).
Bedford's final challenge to his kidnapping conviction was not raised before the *252 trial court and therefore will not be addressed by this court. See Steinhorst v. State, 412 So.2d 332, 338 (Fla. 1982) (only when fundamental error results will an appellate court consider an issue that was not presented to the trial court).
There is no merit to Bedford's other challenges to his conviction of first-degree murder. We have previously held that the State may proceed on theories of both premeditated and felony murder when only premeditated first-degree murder is charged and that a special verdict form demonstrating which theory the jury based its verdict on is not required. Young v. State, 579 So.2d 721, 724 (Fla. 1991).
Bedford's fourth claim that the trial court erroneously permitted the State to attack the defense's contention that at the time of her death Herdmann was voluntarily engaged in sexual intercourse with Bedford. In connection with this claim, Bedford first maintains that the State was allowed, over objection, to refute this contention by eliciting inadmissible hearsay from Herdmann's sister, Laura Correa, to show that because of a yeast infection Herdmann would not have engaged in intercourse prior to her death.
During direct examination by the State, Correa was allowed to testify that she had seen a tube of cream prescribed to Herdmann for a yeast infection on the bathroom counter. Later, on redirect, Correa testified that she had discussed the infection with Herdmann and knew that Herdmann was not having sex for a week or two before the murder because of the infection.
First, assuming the testimony that the sisters had discussed the yeast infection and Herdmann would not have had intercourse due to the infection contained hearsay statements, this testimony was admissible under section 90.803(3), Florida Statutes (1987), as a then existing mental, emotional, or physical condition. Any statement by Herdmann that she had a yeast infection and was not engaging in sex while she had the infection was a statement of her "then existing state of mind, emotion, or physical sensation, including a statement of intent, ... or bodily health" offered to prove both Herdmann's state of mind and her conduct regarding sexual intercourse prior to her murder. § 90.803(3).
Therefore, even if the testimony that Correa saw a tube of vaginal cream prescribed to Herdmann for a yeast infection were inadmissible hearsay, it was merely cumulative to the properly admitted testimony above. Thus, any error in connection with this testimony was harmless beyond a reasonable doubt. State v. DiGuilio, 491 So.2d 1129 (Fla. 1986).
Bedford next claims that the State was allowed to improperly impeach a defense witness who testified that Herdmann had a reputation for sexual promiscuity by asking the witness "now, you're prosecuted by the State Attorney's Office, are you not?" We agree that this was improper impeachment. See Jackson v. State, 522 So.2d 802, 808 (Fla. 1988) (defense witness' supposed general bias against State, attributable to pending charges concerning a totally distinct offense, is not proper subject for impeachment), cert. denied, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 153 (1988); Fulton v. State, 335 So.2d 280 (Fla. 1976) (same). However, we find any error harmless. Although the testimony concerning Herdmann's reputation for sexual promiscuity lends support to Bedford's version of events, this testimony was merely cumulative to the testimony of a number of other witnesses that Herdmann had engaged in oral sex and had numerous sexual partners. Moreover, because there was no connection between the witness and Bedford, there was no possibility that the improper impeachment had a prejudicial "spill-over" effect. Cf. Fulton, 335 So.2d at 284-85 (not harmless error where testimony went to heart of defense and where there was possibility of "spill-over" effect because witness was defendant's friend).
As his fifth claim Bedford maintains that fundamental cumulative error resulted due to a number of alleged errors[2] which he *253 acknowledges were not objected to at trial. We have reviewed the record and find that none of these alleged errors either individually or in combination resulted in fundamental error. Therefore, none of the issues raised in this claim were preserved for our review. Steinhorst v. State, 412 So.2d at 338.
We also find that Bedford's challenge to the trial court's failure to instruct the jury on the definition of "terrorize" as used in the standard jury instruction on kidnapping was not preserved for appeal because no such instruction was requested. Roman v. State, 475 So.2d 1228, 1234 (Fla. 1985) (contemporaneous objection rule applies to failure to request instruction), cert. denied, 475 U.S. 1090, 106 S.Ct. 1480, 89 L.Ed.2d 734 (1986).
Finding no reversible error during the guilt phase of the trial, Bedford's convictions are affirmed.

PENALTY PHASE
Bedford raises eight claims,[3] with numerous subclaims, in connection with his sentence of death. Because we agree with Bedford's first claim that the jury override was improper, we need not address the remaining challenges to the death penalty, several of which have been previously rejected by this court.[4]
A sentence of death resulting from an override of a jury recommendation of life will not be sustained unless the "facts suggesting a sentence of death [are] so clear and convincing that virtually no reasonable person could differ." Tedder v. State, 322 So.2d 908, 910 (Fla. 1975). In other words, where there is a reasonable basis for the jury's recommendation, an override is improper. Harmon v. State, 527 So.2d 182, 189 (Fla. 1988); Ferry v. State, 507 So.2d 1373, 1376 (Fla. 1987).
The jury, in this case, reasonably could have concluded from the evidence that Walsh had instigated the entire incident including Herdmann's murder and that Bedford was merely "taking a fall" for Walsh who had threatened to harm Bedford's family. This fact in conjunction with nonstatutory mitigating evidence that Bedford had been honorably discharged from the United States Army and Navy, that he was a nonviolent person, that he was a good father, husband and son, and that he previously had saved lives while assisting paramedics was sufficient to serve as a reasonable basis for a life recommendation. See Wasko v. State, 505 So.2d 1314, 1318 (Fla. 1987) (fact that jury may have questioned the respective roles of defendant and accomplice in the homicide, plus other mitigating evidence, served as reasonable basis for jury recommendation).[5] Accordingly, the death sentence must be vacated.
*254 Finally, we reject Bedford's challenge to his life sentence for kidnapping. The sole reason given by the trial court for the departure from the recommended guidelines sentence of seven to nine years for kidnapping was the "unscoreable capital offense." It is clear that a first-degree murder conviction is not scoreable under the guidelines and therefore constitutes a valid reason for departure. Nixon v. State, 572 So.2d 1336, 1346 n. 5 (Fla. 1990), petition for cert. filed (U.S. June 20, 1991) (No. 90-8493); Torres-Arboledo v. State, 524 So.2d 403, 414 (Fla.), cert. denied, 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988); Hansbrough v. State, 509 So.2d 1081, 1087 (Fla. 1987). We previously have rejected Bedford's contention that a departure sentence based on an unscoreable capital offense is improper where points have been scored for victim injury on the guidelines scoresheet. Henry v. State, 586 So.2d 1033 (Fla. 1991).
Accordingly, Bedford's convictions and sentence of life in prison for kidnapping are affirmed. However, we vacate the sentence of death and remand to the trial court for imposition of a life sentence without possibility of parole for twenty-five years.
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD, BARKETT, GRIMES and KOGAN, JJ., concur.
NOTES
[1] The murder was 1) committed while the defendant was engaged in the commission of a kidnapping; 2) especially, heinous, atrocious, or cruel; 3) committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. See § 921.141(5)(d), (h), (i), Fla. Stat. (1987).
[2] These alleged errors include: 1) admission of "Williams Rule" evidence showing that Bedford had a collection of photographs of nude and dead women; 2) admission of testimony and argument designed to inflame the jury; 3) various instances alleged of prosecutorial misconduct; and 4) comments on Bedford's right to remain silent.
[3] The eight claims are: 1) the jury override was improper; 2) the prosecutor's reliance on victim-impact evidence and other improper sentencing factors require resentencing; 3) the trial court erred by considering the presentence investigation report; 4) the trial court committed substantial errors in the sentencing order by a) finding the murder heinous, atrocious, or cruel, b) finding the murder was committed in a cold, calculated, and premeditated manner, c) finding that the murder occurred during the commission of a kidnapping, and d) failing to find mitigating factors; 5) the trial court erred by sentencing Bedford without allocution; 6) the death penalty is disproportionate in this case; 7) the aggravating circumstances used are unconstitutional; and 8) the Florida death penalty statute is unconstitutional.
[4] We have previously held that the sentencing court may rely on PSI reports. Young v. State, 579 So.2d 721, 725 (Fla. 1991); Engle v. State, 438 So.2d 803 (Fla. 1983), cert. denied, 465 U.S. 1074, 104 S.Ct. 1430, 79 L.Ed.2d 753 (1984). The challenges as to the constitutionality of the death penalty statute also have been rejected. Van Poyck v. State, 564 So.2d 1066 (Fla. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1339, 113 L.Ed.2d 270 (1991). Bedford's arguments regarding the constitutionality of the aggravating factors of heinous, atrocious, or cruel, and cold, calculated, and premeditated have likewise been rejected. Robinson v. State, 574 So.2d 108, 113 n. 6 (Fla.), petition for cert. filed (U.S. May 29, 1991) (No. 90-8277).
[5] We also note that the jury properly could have rejected the aggravating factor that the murder was committed in a cold, calculated, and premeditated manner because, as Bedford correctly points out, there was insufficient evidence of the heightened premeditation necessary to support this factor. While there was evidence of a careful plan or prearranged design to scare the victim by taking her to the Everglades and leaving her, there was no evidence of a prearranged plan to kill her. Holton v. State, 573 So.2d 284, 292 (Fla. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 2275, 114 L.Ed.2d 726 (1991); Rogers v. State, 511 So.2d 526, 533 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988).