831 So.2d 738 (2002)
Mollie EVERETT, Appellant,
v.
STATE of Florida, Appellee.
No. 4D00-4165.
District Court of Appeal of Florida, Fourth District.
November 13, 2002.
*739 Carey Haughwout, Public Defender, and Ursula Cogswell and Marcy K. Allen, Assistant Public Defenders, West Palm Beach, for appellant.
Richard E. Doran, Attorney General, Tallahassee, and Meredith L. Balo, Assistant Attorney General, Fort Lauderdale, for appellee.
STEVENSON, J.
Appellant, Mollie Everett, was charged with exploitation of the elderly and grand theft and tried by jury. The trial court granted a judgment of acquittal on the grand theft charge, but the jury convicted Everett on the exploitation of the elderly count. On appeal, Everett argues that the trial court erred in denying her motion for judgment of acquittal for exploitation of the elderly. We agree and reverse.
Appellant was charged with exploitation of an elderly person, for a value of $20,000 or more, and grand theft, both charges relating to the same property. During trial, Christina Arner, an employee of the South Florida Guardianship Program (the agency), testified that the agency was originally appointed as guardian for Francis Frederick's daughter, Glenda, who is mentally incapacitated. Arner and two other social workers first visited Frederick's home on July 14, 1998, to assess the situation and determine what the agency needed to do to intervene on Glenda's behalf. The house was very dark and dirty, the windows were closed providing no air flow, there were cockroaches and cobwebs, and the toilet was overflowing. And, to make matters worse, there had been a kitchen fire resulting in smoke damage, and it appeared that there was no electricity.
During the home visit, Arner became concerned not only for Glenda, but also for Frederick, who was in her seventies. Arner informed Frederick of her concerns and that she would be seeking to establish a guardianship for Frederick. Arner reported the conditions in the home to her office and called the abuse hotline, thus involving the Department of Children and Families (DCF). Two days later, the agency petitioned the court for emergency temporary guardianship of Frederick. On July 16, 1998, the court appointed the agency as Frederick's emergency temporary guardian, giving them authority to make decisions on her behalf and making them responsible for her financial affairs and assets.
When Arner returned to the home on July 20th, Mollie Everett was there with Frederick and work had been done on the house. There was new carpeting, the windows were open, there was a fan in the living room, and the house was cleaner. Arner, concerned about who was paying for the improvements, introduced herself to Everett and explained the guardianship. Everett responded that she was Frederick's goddaughter and that Frederick had already told her about the guardianship. Arner did not want to discuss the situation further in front of Frederick because it was upsetting to Frederick that the agency was involved so she asked Everett to make an appointment to come to her office.
On August 4, Everett went to Arner's office. Elaine Laird, Assistant Director of Finances for the agency, also joined the meeting. Everett brought checks and receipts to show what she had spent on Frederick's home improvements. Everett signed an affidavit stating that on July 17, 1998, she took Frederick to Barnett Bank at Frederick's request and closed out one *740 of Frederick's accounts in the amount of $38,604.79. The money from the account was issued in two checks in the amounts of $5,000 and $28,604.79, and cash in the amount of $5,000. In the affidavit, Everett acknowledged that she had provided receipts in the amount of $15,961.62 to the agency, but that approximately $14,831.74 that was in her possession was unaccounted for by those receipts.[1] Everett didn't offer an explanation for the unaccounted money that day, but told Laird that she would look for more receipts and come back later.
Subsequently, Everett contacted Arner, stating that she wanted to account for the rest of the money. They agreed to meet again on August 7th, and this time, Bill Simpson, another social worker, was present. At the meeting, Everett signed an additional affidavit which was read into evidence at trial. According to this affidavit, Everett's attorney had advised her to offer some additional information to the agency. Everett stated in the affidavit that after the money was withdrawn from the bank, Frederick asked Everett to take her to the post office so that Frederick could send $5,000 in cash to a "psychic" in South Carolina who could help keep the guardianship agency out of her affairs. Later, Frederick sent another $4,000 cash to this same woman. Everett also stated that Frederick kept $1,000 in cash.[2]
Cynthia Riles and Alfred Nuevo, protective investigators with DCF, became involved with the case because of the abuse hotline report. Nuevo was assigned to Frederick's case in September of 1998 after Riles was transferred to another case. Everett spoke with Riles on August 14, 1998, and Nuevo in October of 1998. According to Riles and Nuevo, Everett stated that she was Frederick's goddaughter and admitted taking Frederick to the bank. Everett claimed, however, to have no knowledge of the whereabouts of the rest of the money and did not mention the money sent to the "psychic" in South Carolina. According to Nuevo, he could not talk to Frederick as she lacked the capacity to be a reliable source.
Defense counsel moved for a judgment of acquittal, arguing that the State failed to prove that Everett endeavored to unlawfully obtain or deprive Frederick of her funds. In addition, the defense stressed that there was no evidence that Everett took the money; rather, at best, some of the money was simply unaccounted for by written receipts. The trial judge apparently accepted Everett's argument and stated:
[T]here has to be some evidence that the defendant took this money from Francis Frederick.... Unless I missed it, there was none. The record seems totally void of any testimony that anything was taken from Ms. Frederick and appropriated by the defendant.
. . . .
The taking has to be with the intent to appropriate it to her own use or to the use of somebody else.... Where is there any showing of intent, that the defendant had the intent to temporarily or permanently deprive Frances Frederick of her right to the property and appropriate it to her own use? *741 The trial court then granted the motion for judgment of acquittal as to count two (grand theft), but denied it as to count one (exploitation of an elderly person).

Discussion
A special standard of review of the sufficiency of the evidence applies where a conviction is wholly based on circumstantial evidence. See State v. Law, 559 So.2d 187, 188 (Fla.1989)(citing Jaramillo v. State, 417 So.2d 257 (Fla.1982)). Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. See McArthur v. State, 351 So.2d 972 (Fla.1977). Furthermore, a motion for judgment of acquittal should be granted in a circumstantial evidence case if the State fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt. See Law, 559 So.2d at 188 (citing Wilson v. State, 493 So.2d 1019, 1022 (Fla.1986)).
Upon close review of the record, we agree with appellant that the State failed to present competent, substantial evidence of exploitation from which the jury could exclude every reasonable hypothesis except that of guilt. Although the State is not required to conclusively rebut every variation of events which may be inferred from the evidence, it is required to present competent, substantial evidence which is inconsistent with appellant's theory of events. See Law, 559 So.2d at 189. Here, the State presented no evidence contrary to Everett's theory that she used the missing money as claimed and returned the unaccounted-for money to Frederick. Therefore, as a matter of law, the State's evidence was insufficient to sustain a conviction.
Count I of the information charged appellant with exploitation of the elderly as provided in section 825.103, Florida Statutes. Subsection (1)(a) essentially has three basic elements and subsection (1)(b) has two. In brief, to prove exploitation under section 825.103(1)(a), the State was required to establish that: (1) the defendant stood in a position of trust and confidence with the victim; (2) the defendant obtained funds belonging to the victim with the intent to temporarily or permanently deprive the victim of those funds; and (3) the defendant used deception or intimidation to obtain the funds. See § 825.103(1)(a)1., Fla. Stat. (2001).[3] To establish exploitation under section 825.103(1)(b), the State was required to prove that: (1) the defendant obtained funds belonging to the victim with the intent to temporarily or permanently deprive the victim of those funds and (2) the defendant knew that the victim lacked the capacity to consent to this taking. The one common element of a conviction predicated on either subsection (1)(a) or (1)(b) is proof that the defendant attempted to, or obtained or used funds of the elderly victim with the intent to temporarily or permanently deprive the victim of those funds. Here, the evidence was legally insufficient to establish this essential element.
Intent to temporarily or permanently deprive
In the instant case, as the trial court recognized, there was no proof that Everett took Frederick's money with the intent to deprive her of it either temporarily or permanently. The State's only "proof" that Everett obtained Frederick's funds with the intent to temporarily or permanently deprive Frederick of those funds was its attack on Everett's accounting for *742 those funds. Yet, the State presented no proof that her accounting was false. And, while the defendant failed to precisely account for the funds and her explanation of how the funds were spent was unusual, there was no evidence to contradict her version of the facts.
This case is distinguishable from Deranger v. State, 652 So.2d 400 (Fla. 2d DCA 1995), relied on by the State in its brief. There, the victim was an elderly man residing with his bedridden wife. Deranger met the victim around 1980 when she was nineteen years old and working as a topless dancer. The two began an intimate relationship, and the victim gave Deranger money and gifts for her companionship. Later, Deranger married Robert Ware, but her relationship with the victim continued, with Ware's knowledge and consent. By 1990, the victim was exhibiting signs of reduced mental capacity. During this time, he gave Deranger or Ware forty-six checks totaling $67,961, many of which were deposited into their joint account. Deranger claimed that the money was given in exchange for her promise to take care of the victim in the future. See id. at 401.
Initially, the court in Deranger noted that, under Florida law, even in the absence of any direct testimony by the victim, the nonconsent to a felonious taking may be shown by circumstantial evidence:
The victim's nonconsent to a transfer of property can be proven by circumstantial evidence. Bowles v. State, 153 Fla. 219, 14 So.2d 269 (1943). That proof may include evidence that the defendant knew the victim lacked the mental capacity to consent to the taking of his or her property. Id.

652 So.2d at 401. The court then rejected the argument that the circumstantial evidence of guilt did not overcome Deranger's reasonable hypothesis of innocence, i.e., that the checks were payment for future services. The court found that "[t]he evidence of the victim's failing mental status, especially in conjunction with the unusual number of sizable checks to Ms. Deranger and her husband over an extended span of time, was sufficient to permit a jury to find that the transfers constituted theft." Id. (citing State v. Law.)
In the instant case, unlike in Deranger, there was no proof that Everett took any money for her own use and no evidence inconsistent with Everett's statement that she did not retain any of Frederick's money. In Deranger, the money wound up in the defendant and her husband's joint bank account. Although there was evidence here that Everett knew of the victim's failing mental capacity, there simply was no evidence from which the jury could reasonably conclude that Everett exploited the victim either by obtaining, or trying to obtain, the victim's funds with the intent of temporarily or permanently depriving the victim of them. Here, there were no deposits into the defendant's bank accounts, no unexplained sudden acquisition of property in the defendant's name. In the end, Everett stated that any money which was not accounted for by a receipt, or her own recollection, was given to Frederick. The State presented no evidence inconsistent with this claim.
Our resolution of this case is buttressed by the trial court's judgment of acquittal on the grand theft charge, which was the basis of the exploitation charge. In Thomason v. State, 790 So.2d 1189 (Fla. 4th DCA 2001), this court held that dual convictions for exploitation of the elderly and grand theft violated double jeopardy where, as here, the crimes charged involved one act of taking the same property. Accord Rich v. State, 823 So.2d 208 (Fla. 2d DCA 2002); Williams v. State, *743 823 So.2d 145 (Fla. 5th DCA 2002). In Rich, the Second District wrote:
We have reviewed the exploitation statute, section 825.103, Florida Statutes (1999), and the staff analysis of the bill which enacted the statute. See Fla. H.R. Comm. on Aging & Human Servs., H.B. 79, Bill Analysis and Economic Impact Statement (Final July 11, 1995). Neither the exploitation statute nor the staff analysis which preceded its passage provides a statement of legislative intent to authorize separate punishments for exploitation of the elderly and grand theft. In the absence of a clear statement of legislative intent, courts must apply the Blockburger "same elements" test to determine whether multiple punishments violate double jeopardy. Gordon v. State, 780 So.2d 17 at 19-20 (Fla. 2001).
Rich, 823 So.2d at 209.
We agree with the Second District's analysis in Rich. Because of the interlocking nature of these charges, it follows that failure to establish the underlying theft must result in the same outcome on the greater exploitation charge.
Further, the "true" inconsistent verdict rule prohibits conviction of a crime when "an acquittal on one count negates a necessary element for conviction on another count." Gonzalez v. State, 440 So.2d 514, 515 (Fla. 4th DCA 1983). The judgment of acquittal in this case negated the necessary element of theft in the exploitation count. See Hudson v. State, 711 So.2d 244, 247 (Fla. 1st DCA 1998)("`[T]he ruling of the judge ... actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged.'")(quoting United States v. Martin Linen Supply Co., 430 U.S. 564, 571, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977)). Consequently, there could be no conviction on the exploitation charge, which was based on the underlying grand theft. See State v. Powell, 674 So.2d 731, 733 (Fla.1996)(citing Gonzalez ). Indeed, the foregoing authorities suggest that the trial court's ruling on the judgment of acquittal, whether it was right or wrong, necessarily requires a reversal in this case. See id.; Hudson, 711 So.2d at 247.
Accordingly, we REVERSE and direct the trial court to vacate Everett's judgment and sentence.
MAY, J., concurs.
GUNTHER, J., concurs in part and dissents in part with opinion.
GUNTHER, J., concurring in part and dissenting in part.
Although Everett did not raise this argument, I agree with the majority that Everett's acquittal on the grand theft charge warrants reversal of her conviction for the exploitation charge. The doctrine of collateral estoppel operates "to bar subsequent prosecution where one of the facts necessarily determined in the former trial is an essential element of the crime presently charged." State v. Strong, 593 So.2d 1065, 1067 (Fla. 4th DCA 1992)(citing United States v. DeMarco, 791 F.2d 833 (11th Cir.1986)). A pre-verdict acquittal based on a judge's determination "that the evidence does not establish the fact of a crime" cannot be reviewed without violating the Fifth Amendment guarantee against double jeopardy. Hudson, 711 So.2d at 247.
In Everett's case, the trial court's judgment of acquittal on the grand theft charge rested upon its conclusion that the State did not make a prima facie showing that Everett intended to deprive Frederick of her money. Thus, the acquittal was a former determination that there was insufficient evidence to prove the intent to deprive, *744 an essential element of both grand theft and exploitation of the elderly. § 812.014, Fla. Stat. (1997); § 825.103(1)(b) (1997). This determination of the essential element of intent to deprive bars Everett's prosecution for the exploitation charge, and whether the trial court was correct or not, the acquittal evades review because of the prohibition against double jeopardy. Hudson, 711 So.2d at 247.
I respectfully disagree, however, with the majority's analysis regarding Everett's claim that the evidence actually adduced at trial is insufficient to support the jury's verdict. The majority correctly states that convictions founded upon circumstantial evidence are sustainable only when the State's evidence is inconsistent with any reasonable hypothesis of innocence. State v. Law, 559 So.2d 187, 188 (Fla.1989). This standard does not, however, require the State to "rebut conclusively" the defendant's theory of innocence. Griggs v. State, 753 So.2d 117, 119 (Fla. 4th DCA 1999) (quoting State v. Law, 559 So.2d at 189). If the State offers competent substantial evidence that is inconsistent with the defendant's theory, the State has met its burden. Id.
Everett's theory of innocence is that she helped Frederick keep her home by spending some of the money on improvements, that at Frederick's request they drove to the post office to mail some of the money to a woman in South Carolina to place a hex on the guardianship, and that the rest of the money she gave back to Frederick. Among the State's evidence were two affidavits given three days apart. In the first, Everett admitted that Frederick gave her $38,604.79 to hold and that $14,831.74 of this money was "unaccounted for." In the second, Everett stated that on the advice of her attorney she was now stating that Frederick kept $1,000 in cash and instructed her to send two separate cash payments totaling $9,000 to the woman in South Carolina, and that these events accounted for the missing funds. Even if true, this would account for only $10,000 of the $14,831.74 that Everett initially said was unaccounted for. Later, in a sworn statement to police, Everett simply stated that she returned all of the money to Frederick.
The jury had before it evidence that Everett had given three inconsistent versions of what happened to Frederick's money. Thus, the majority's statement that there was no evidence to contradict Everett's version of the facts begs the question: which one? Everett contradicted herself, which is not less but more compelling than if a separate witness had contradicted her. The State's burden was to offer evidence inconsistent with Everett's theory of innocence that she returned all of the money to Frederick. The State did this with Everett's own statement that $14,831.74 of this money was "unaccounted for."
A similar scenario of a defendant offering inconsistent versions of events arose in Bedford v. State, 589 So.2d 245 (Fla.1991). At trial, the defendant claimed that the victim, whose body was found bound and gagged in a dumpster, died accidentally during an act of consensual sex. Bedford, 589 So.2d at 250. During the investigation, however, the defendant gave police numerous conflicting statements ranging from his having no involvement in the victim's death to admitting that he only wanted to scare her by leaving her naked, bound, and gagged in the Everglades. Id. at 247-48.
Although on appeal the defendant argued that the circumstantial evidence was insufficient to support his conviction, the supreme court affirmed, stating that "[t]he circumstantial evidence rule does not require *745 the jury to believe the defendant's version of the facts." Id. at 250. The court reasoned that "[b]ecause each of Bedford's several versions of events was inconsistent with the others, the jury reasonably could have concluded that each of these accounts was untrue." Id. at 250-51 (citing Holton v. State, 573 So.2d 284, 290 (Fla.1990)); Carpenter v. State, 785 So.2d 1182 (Fla.2001) ("In similar situations, we have routinely held that the jury was free to reject the defendant's version of the events.") (citing Finney v. State, 660 So.2d 674, 680 (Fla.1995) ("In light of Finney's inconsistent statements concerning his interactions with the victim and his activities on the day of the murder, the jury was free to reject Finney's version of events as unreasonable.")).
This reasoning applies equally to this case. Everett's conflicting statements support the inference that her ultimate version of events, that she returned all of the funds, is untrue. Thus, I disagree with the majority's conclusion that the State did not present evidence contradicting Everett's claim that she gave all of the money back. Everett's initial affidavit acknowledges that $14,831.74 was unaccounted for, which is inconsistent with Everett's claim that she gave it all back. Everett's statements cannot both be true, yet the majority holds that because Everett did not deposit the money in a bank account the jury must accept her claim that she gave it all back.
Although it would have made a stronger case, the law simply does not require the State to conclusively rebut Everett's theory of innocence by submitting evidence, such as bank statements or a comparison of her income and expenditures, that she kept the money. I conclude that it is enough that the State established Everett's custody of the money through her affidavits, then countered her claim that she gave all of the money back with her conflicting statements that the money was unaccounted for, or that she sent it to South Carolina at Frederick's direction, or that she simply returned all of it that was not spent on the house to Frederick. After that, it is for the fact-finder to determine if the evidence, taken as a whole, excludes all other inferences. Hampton v. State, 549 So.2d 1059 (Fla. 4th DCA 1989).
NOTES
[1] Everett also gave Arner and Laird a check written in the amount of $7,811 to establish a checking account for the guardianship.
[2] There was testimony that Frederick had purchased a new car for $10,500 cash, but it was unclear where this money came from. The witnesses at trial seemed to assume that this car was purchased using funds withdrawn from the account.
[3] The 1997 version in effect at the time of the crime is identical.