985 So.2d 1199 (2008)
Jesse CARRANZA, Appellant,
v.
STATE of Florida, Appellee.
No. 4D07-1480.
District Court of Appeal of Florida, Fourth District.
July 9, 2008.
*1200 Jonathan R. Kaplan of Jonathan R. Kaplan, P.A., West Palm Beach, for appellant.
Bill McCollum, Attorney General, Tallahassee, and Daniel P. Hyndman, Assistant Attorney General, West Palm Beach, for appellee.
WARNER, J.
In this appeal from a conviction of first-degree murder, appellant claims that the trial court erred in denying his motion for judgment of acquittal, arguing that the state failed to prove premeditation and that it failed to present evidence inconsistent with his reasonable hypothesis of innocence. Because there was competent substantial evidence to support the trial court's judgment, we affirm.
In October of 2000, sheriff's deputies responded to a report of a body in a canal. Lead detective Carney found the body of a female victim clad with only a top, bra, and socks. Within a short period of time, Carney was able to identify the victim as Amy Bataille. Later he contacted her boyfriend, Terry Sandoval, whom he interviewed multiple times. Sandoval maintained that he and Amy were together the evening of her murder. They engaged in sexual intercourse but got into an argument, and Sandoval left. He did not see Amy again. Neighbors informed Carney that Sandoval was an angry person who frequently argued with Bataille. Carney also learned that Sandoval attempted to kill his prior girlfriend by strangling her.
Bataille's autopsy revealed semen. The semen extracted revealed the presence of DNA, but it did not match Sandoval's DNA. Carney took DNA samples from multiple other persons but could not find a match.
Despite all of Carney's efforts, he could not identify a suspect, although he always believed that Sandoval probably was the perpetrator. Carney retired from the sheriff's department without solving the murder. The case went cold.
In 2004 Detective Vanhouten of the cold case unit reopened the investigation. After reviewing phone records, he discovered that phone calls from Sandoval went to a residence where appellant Jesse Carranza lived. Carranza was related to Sandoval by marriage. Ultimately, Vanhouten contacted Carranza. This contact led to several incriminating statements made by Carranza describing his involvement in Bataille's murder, as well as an identification *1201 of his DNA in the semen found in Bataille's body.
In his first statement, Carranza told Vanhouten that he received a call one night in 2000 from Sandoval to come to the apartment of Sandoval's girlfriend (Bataille). Carranza had been drinking and ingested a substantial amount of cocaine. When he got to the apartment, the two went to purchase more cocaine. After they returned from buying cocaine, Sandoval asked Carranza whether he wanted to "mess around" with his girl. Carranza stated that they both went into the bedroom and had sex with her.
Carranza left the bedroom to watch television and drink. Sandoval came out of the bedroom and asked Carranza whether he was up for a "187," which Carranza understood to be a murder. Carranza responded, "Yea, whatever." Sandoval then went back into the bedroom while Carranza continued to watch television. Carranza did not hear any sounds from the bedroom. Sandoval came out and told Carranza that he "did it," and Carranza should check her out. Carranza went into the bedroom and saw Bataille on the bed. Carranza put his ear to her mouth and could not hear anything. Sandoval then asked Carranza to help him dispose of the body. They carried it out to the car and drove to the canal where officers found Bataille the following morning.
About a month and a half after Carranza gave the foregoing statement, Detective Vanhouten accompanied him to testify before a grand jury. On the way, Carranza informed Vanhouten that he had not been entirely truthful with him. He then gave a second statement regarding what occurred on the night of the murder.
His second statement varied from the first in that Carranza said that he did not see Bataille at all in the apartment until the murder. Thus, he denied having sex with her. He also claimed that he saw Sandoval having sex with Bataille after Sandoval had killed her. When they disposed of the body, Sandoval again had sex with her, and then Carranza did the same.
After Carranza completed this statement, he gave another one. In this one, Carranza claimed that when he first examined Bataille's body, he listened for her breathing but admitted that he was not sure whether she was dead. Sandoval came back in the room and urged him to "finish it, finish it!" Carranza then put his hands around her neck and choked her. He removed a scarf or sock which was around her neck. He did not tighten the scarf on her neck. He told one detective that he choked her hard enough to keep her from breathing. He made various estimates of how long he did thisfrom several seconds to a couple of minutes. Afterwards he returned to watch television. He did not speak to Sandoval.
At trial the medical examiner testified that Bataille died of manual strangulation. He denied that ligature, or strangulation with a cord or rope, was the cause of death. Furthermore, he noted various bruises on the victim's body, including around her mouth, indicating that someone had forcibly covered her mouth. Other bruises were consistent with someone holding her down forcibly. She died a violent death. The injuries sustained could have been inflicted by more than one person. The examiner also testified that in the process of strangulation, a victim could become unconscious, but a lay person would not be able to determine if the person was alive or dead.
Carranza moved for judgment of acquittal at the close of the state's case, claiming only that the state failed to prove premeditation. The trial court denied the motion. *1202 Carranza called three witnesses, all of whom testified to various statements by Sandoval implicating himself in Bataille's murder and claiming that Carranza only helped dispose of the body. At the close of the evidence, Carranza renewed his motion for judgment of acquittal, which the court again denied. After closing argument, the court found the defendant guilty of premeditated murder, as the case was tried to the court and not a jury.
On appeal, Carranza raises the issue of lack of evidence of premeditation and also a different issue: whether the state presented evidence inconsistent with Carranza's reasonable hypothesis of innocence that Sandoval murdered Bataille. We address both issues.
In convicting a defendant for first-degree premeditated murder under section 782.04(1)(a)1., Florida Statutes, the state must prove beyond a reasonable doubt that the victim is dead, the death was caused by the criminal act of the defendant, and there was a premeditated killing of the victim. Fla. Std. Jury Instr. (Crim.) 7.2. Carranza was also charged as a principal to the crime of murder. "In order to be convicted as principal for a crime physically committed by another, the defendant must intend that the crime be committed and must do some act to assist the other person in actually committing the crime." Terry v. State, 668 So.2d 954, 964-65 (Fla. 1996) (citing § 777.011, Fla. Stat. (1993)) (citation omitted).
In Norton v. State, the supreme court stated:
Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as the nature of the act to be committed and the probable result of that act.
709 So.2d 87, 92 (Fla.1997) (quoting Coolen v. State, 696 So.2d 738, 741 (Fla.1997)). Here, the state presented sufficient evidence of premeditation to withstand a judgment of acquittal. Carranza was a principal to the murder. Sandoval asked Carranza if he were up for a 187, or murder, to which Carranza replied in the affirmative. Thus, it is clear that Sandoval expressed a conscious purpose to kill to which a trier of fact could find that Carranza assented. When Sandoval came out of the bedroom and said, "I did it," and Carranza went into the bedroom, Sandoval urged him to "finish it." Carranza responded by choking her with sufficient strength to cut off her breathing. He choked her for several seconds to several minutes. Bataille died of manual strangulation.
Carranza expressed his intent to participate in murder and by choking Bataille did an act to assist Sandoval in committing the crime. This evidence was sufficient to show a conscious intent to participate in the murder, and the state presented sufficient evidence of premeditation to withstand a judgment of acquittal.
The second issue regarding the state's failure to present evidence inconsistent with Carranza's reasonable hypothesis of innocence has not been preserved for appeal. "To preserve an argument for appeal, it must be asserted as the legal ground for the objection, exception, or motion below. Florida Rule of Criminal Procedure 3.380 requires that a motion for judgment of acquittal `fully set forth the grounds on which it is based.'" Woods v. State, 733 So.2d 980, 984 (Fla.1999) (quoting Fla. R.Crim. P. 3.380(b)) (citations omitted). Nevertheless, had it been preserved, the trial court properly denied the motion.
*1203 Carranza's reasonable hypothesis of innocence was that Sandoval committed the murder, and Bataille was dead before he put his hands around her throat and choked her. The defendant himself indicated his agreement to participate in a murder, and he choked the victim for several minutes with sufficient force to keep her from breathing when he was not sure whether she was already dead. His own statements provide evidence inconsistent with any reasonable hypothesis of innocence.
Most importantly, he made several inconsistent statements to the detectives. That in and of itself can constitute grounds upon which a trier of fact may reject the defendant's reasonable hypothesis of innocence. In Carpenter v. State, 785 So.2d 1182, 1195 (Fla.2001), the court noted:
In similar situations [where defendant has made several inconsistent statements], we have routinely held that the jury was free to reject the defendant's version of the events. See, e.g., Finney v. State, 660 So.2d 674, 680 (Fla.1995) ("In light of Finney's inconsistent statements concerning his interactions with the victim and his activities on the day of the murder, the jury was free to reject Finney's version of events as unreasonable."); Bedford v. State, 589 So.2d 245, 250-51 (Fla.1991) ("Because each of Bedford's several versions of events was inconsistent with the others, the jury reasonably could have concluded that each of these accounts was untrue.").
Carranza's entire explanation was also inconsistent with the medical evidence. The bruises on the victim indicated that she was being held down, and the bruises around her throat indicated that she was manually strangled. Her death involved a violent struggle, according to the medical examiner, which could have included more than one perpetrator. Carranza testified that he found a scarf around her neck, suggesting that Sandoval had strangled her with a scarf, but the medical examiner testified that she did not show signs of ligature. The only person who testified that he had his hands around her throat was Carranza.
Finally, at the very least, the state presented evidence that Sandoval specifically denied being present at the scene, having left the apartment after an argument. That too is inconsistent with Carranza's hypothesis that Sandoval killed Bataille.
As we conclude that there was competent substantial evidence to support the trial court's findings, we affirm.
POLEN and TAYLOR, JJ., concur.