# Supreme Court of Florida

---

No. SC14-787

---

**CHARLES GROVER BRANT,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

---

No. SC14-2278

---

**CHARLES GROVER BRANT,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[June 30, 2016]

PER CURIAM.

Charles Grover Brant appeals an order denying his motion to vacate his convictions and sentences—including a conviction for first-degree murder and sentence of death—filed under Florida Rule of Criminal Procedure 3.851 and

petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons expressed below, we affirm the denial of postconviction relief and deny Brant's habeas petition.

## I. BACKGROUND

On July 2, 2004, twenty-one-year-old Sara Radfar was found dead in her home. Brant v. State, 21 So. 3d 1276, 1277 (Fla. 2009). A rear window of her duplex was open, and the front door was locked from the inside. Id. Radfar's body was found in the bathtub with water running over it. Id. A plastic bag was found over her head, and a dog leash, an electrical cord, and a women's stocking were found around her neck. Id. The cause of death was determined to be strangulation and suffocation. Id.

During a canvas of the neighborhood, detectives spoke with Brant, who was a neighbor of the victim. Id. Brant initially denied any involvement in the murder and told the officers that on the night of the homicide, he saw a man with long hair in a white button-down shirt with Radfar and that the next day, he saw a man in a yellow raincoat and black pants running behind his residence. Id. As part of the homicide investigation, Brant's garbage was collected from outside his home. Id. In it, investigators discovered Radfar's debit card, a man's white cotton shirt, a yellow raincoat, a pair of black pants, a mass of long, brown hair, four latex gloves, and a box that had contained women's stockings. Id.

Brant was interviewed again on July 4, 2004. Id. at 1278. During that interview, Brant confessed to Radfar's murder. Id. Brant explained that he went to Radfar's home on July 1, 2004, to take pictures of her tile floor, which he had installed, for his portfolio. Id. Radfar let him in, and while he was taking photographs, Brant grabbed Radfar, dragged her into one of the bedrooms, and sexually assaulted her. Id. He put a sock in her mouth to quiet her and then started to choke and suffocate her. Id. When he thought that she had either lost consciousness or died, he started walking around in the house. Id. When Radfar regained consciousness and ran to the front door, Brant dragged her back into the bedroom and again began to choke and suffocate her. Id. He stated that the choking and suffocation went on for some time. Id. Brant then took Radfar, who was still breathing and hiccupping, to the bathroom and put her in the tub. Id. He wrapped a stocking, a dog leash, and an electrical cord around her neck. Id. After Radfar died in the tub, Brant moved her car out of the driveway, cleaned up the duplex, changed his clothes, and walked home. Id. Brant also stated that he went back into Radfar's residence the next day and tried to wipe away his fingerprints. Id.

In May 2007, Brant pleaded guilty to first-degree murder, sexual battery, kidnapping, grand theft of a motor vehicle, and burglary with assault or battery. Id. at 1277. After a failed attempt to seat a penalty-phase jury in August 2007,

Brant waived his right to a jury, and the penalty phase proceeded before the trial

judge. The evidence presented during the penalty phase was set forth in our

opinion on direct appeal as follows:

> The State . . . called Melissa Ann McKinney, Brant's former wife, who testified that she and Brant were married from June 1991 until December 2004 and that they have two sons together. McKinney explained that she and Brant met in 1990 when they were students at a Bible college in Virginia but left the school voluntarily before either graduated. . . .
>
> McKinney explained that she and Brant separated eight or nine times during their thirteen-year marriage due to Brant's drug use. Brant used marijuana continuously and began using ecstasy around 1999. McKinney testified that Brant began using methamphetamine about six months before the murder. He obtained a package of it "like every week." McKinney explained that while using methamphetamine, Brant would stay up for four or five nights in a row without sleep and then crash. During the first few days of a cycle, he would be very productive and "cheerful . . . in a better mood but he was always fidgety." When Brant would start coming off the drug, he would not finish tasks because he was looking for more drugs. By day four or five, he was "[i]rritable, snappy." McKinney explained that during the six months Brant was using methamphetamine, "he became a different person" and "it seemed like he didn't care anymore. He didn't—all he wanted was that drug, and he didn't care if he finished jobs. He didn't care about his family. I mean, he just he became obsessed with sex." Beginning about two weeks before the murder, McKinney noticed Brant talking to himself while he worked.
>
> McKinney also testified that in approximately 2000, Brant asked her to participate in sex games involving force. About two years before the murder, the games became rougher, and because she was afraid she would be hurt, McKinney began to object. Brant would surprise McKinney by hiding in the house, wearing a mask and latex gloves, and grabbing her from behind. McKinney stated that she believed Brant sometimes would even hide his car to give the impression that he was not at home in order to surprise her more effectively. She explained that during that two-year period, they had

- 4 -

intercourse almost daily and that Brant "would get violent" and "do the scaring" every couple of weeks.

McKinney testified that Brant became sneakier and more violent when he began using methamphetamine. For example, on Wednesday, June 30, 2004, the night before the murder, Brant hid in a closet and attacked McKinney when she came into the room. He put her on her stomach on the bed, bound her hands, and attempted to put a sock in her mouth. McKinney explained that she was able to get away from Brant and stayed in the bathroom that night. McKinney stated that she believed Brant was on methamphetamine when he attacked her. He had started staying up on Sunday of that week and had "been up for quite a few days." McKinney further explained that on the morning of Thursday, July 1, 2004, she threatened to go to the police if the games did not stop.

McKinney further testified that on Thursday, Brant was at home when she returned from work at around 6 or 6:30 p.m. McKinney took their sons to see a movie that evening. Brant was invited to attend, but he declined. McKinney stated that they returned home at around 11 p.m. Brant was in the kitchen washing dishes. He was acting nice, which surprised McKinney because they had been angry with each other for a few days. McKinney testified that Brant seemed to be under the influence of drugs when she returned—he was "speedy" and "fidgeting." Brant asked McKinney to cut his hair, which she did. McKinney testified that Brant slept in the bed with her that night, but they did not have sex. McKinney testified that she next saw Brant between 6 and 7 p.m. on Friday. Brant was writing a statement for the police. McKinney testified that he appeared to be under the influence of drugs at that time. She said that "[h]e was acting nervous. He was just acting all over the place, like he was on the drug."

The defense called several lay witnesses and two mental health experts to establish mitigating circumstances.

Crystal Florence Coleman, Brant's mother, testified that their family had a history of depression and other mental health conditions. She also testified about Brant's childhood. She stated that once Brant could walk, "he started beating his head against the floor" and "pounding holes in the walls." She stated that Brant ate plaster and fertilizer as a child. When Brant was around five, Crystal married Marvin Coleman. Crystal testified that Marvin, who drank heavily,

would spank or whip Brant over trivial matters until he bled, would threaten Brant, and "was very derogatory toward" Brant.

Sherry Lee Brant-Coleman, Brant's older sister, similarly testified that Brant's stepfather was an alcoholic and "a bully" to Brant. Sherry testified that Marvin singled Brant out from the other children for more criticism and physical abuse. Sherry also testified about Brant's behavior shortly after the murder. She saw Brant at their mother's Orlando home in early July 2004. She was informed that Brant had told their half-brother, Gar[]ett Coleman, that he was involved in what happened to [the victim] and "that he was hallucinating and he had—was going to turn himself in." Sherry explained that she and several family members and friends went with Brant to a police substation, which was closed because it was a holiday weekend. They then drove to another station. Brant and Gar[]ett went into the station but returned twenty minutes later. They claimed that the law enforcement officers told them there was no information at that station about the [] homicide and that Brant would have to go to a Tampa area station.

Two witnesses, Reverend John Hess, III, a minister affiliated with Blue Ridge Bible College in Rocky Mount, Virginia, and Pastor Leon Wendall Jackson, of the Faith Family Worship Center Assembly of God Church in Citrus Park, testified that Brant had spoken to them about having a drug use problem. Reverend Hess testified that Brant was a student at the Bible college, then known by a different name, for one semester in 1990. Reverend Hess explained that in approximately 1997, Brant contacted Hess about reapplying to the school, stating that he had gotten reinvolved in drugs and was looking to straighten out his life. Hess assured Brant that he could reapply, but Brant did not pursue the option. Pastor Jackson met with Brant and McKinney in 2003 when they were having marital troubles and Brant was having problems with drugs, particularly cocaine. Pastor Jackson counseled Brant about his drug problem and looked into placing Brant in an eighteen-month treatment program. Brant declined to enter treatment because he did not think that he could afford to not work.

Other witnesses testified that they had known Brant to be a nonviolent person, a good father to his children, and a good craftsman. Still other witnesses testified about the grief and remorse that Brant had expressed since being incarcerated.

Defense expert witness Michael Scott Maher, M.D., a physician and psychiatrist, diagnosed Brant as suffering from severe methamphetamine dependence associated with psychotic episodes, sexual obsessive disorder, and chronic depression. Dr. Maher described Brant as a lifestyle user of methamphetamine and explained that lifestyle users begin using methamphetamine to support working long hours but that the use "almost inevitably results in a dependency and a deterioration," ultimately leading to psychosis. Dr. Maher opined that Brant's dependency had reached the point of causing psychosis . . . .
Dr. Maher explained that during a period of methamphetamine-induced psychosis, Brant would be highly energized, would have a pattern of irritability and behavioral fidgetiness, and would hear, see, or feel things that he was not entirely sure were real. Dr. Maher identified poor impulse control as "a substantial hallmark of methamphetamine abuse." Dr. Maher further explained that because Brant's "purpose and motivation for using the drugs was to work and ultimately to promote and participate in his idea of being a good husband and a good father and a good worker," Brant would have been "making a very substantial effort to use the mental functioning that he still had in a way to appear normal." Dr. Maher testified that after his arrest, Brant was given "antipsychotic medications and some other medications to help him calm down."

Dr. Maher concluded that Brant suffered from sexual obsessive disorder based on descriptions of the "psychological force of those sexual urges" provided by Brant and McKinney. Dr. Maher stated that Brant's "pattern of sexual behavior with his wife which predated this incident and . . . his severe use of methamphetamines . . . are consistent with an obsessive pattern of sexual interest." Dr. Maher explained that the sex games between Brant and his wife had "a general effect of creating lower inhibitions to this kind of link between surprise, violence and sex" and that these lowered inhibitions were "clinically significant in understanding" Brant's behavior at the time of the sexual battery and murder.

Dr. Maher further testified that Brant had a history of depression and relationship problems going back into childhood. Dr. Maher opined that Brant's relationships with his mother, grandmother, stepfather, and wife all showed significant patterns of pathology. Dr. Maher testified that Brant began to use marijuana and alcohol as an

adolescent to self-medicate and "escape from his chronically depressed and anxious state of mind."

Finally, Dr. Maher testified that Brant might suffer from abnormal brain functioning. Dr. Maher explained that the twenty-five point difference between Brant's verbal and performance IQs was indicative of abnormal brain functioning. He also stated that a PET scan of Brant's brain showed four areas of suppressed glucose uptake that could indicate underactivity in those parts of the brain. Dr. Maher identified those portions of the brain as being important to impulse control and good judgment. Dr. Maher stated that while Brant previously was diagnosed with attention deficit disorder, he did not think a diagnosis of adult attention deficit disorder was warranted.

Based on the foregoing, Dr. Maher opined that Brant, while legally sane at the time of the sexual battery and murder, "had, as a result of mental disease, defect, a substantial impairment and limitation in his ability to conform his behavior to the requirements of the law."

Another defense witness, Dr. Valerie R. McClain, a psychologist, testified as an expert in forensic neuropsychology. Dr. McClain diagnosed Brant with polysubstance dependence, major depression recurrent, and cognitive disorder not otherwise specified. Dr. McClain explained that Brant's overall intellectual functioning was in the "low average" range. She testified that school records documented signs of a learning disorder and that Brant's language skills were in the sixteenth percentile compared to other students and his non-language skills were in the sixth percentile. She explained that Brant had problems in the areas of learning, memory, and executive planning or organizational skills. Psychological testing showed signs of depression, pessimism, suicidal ideation, preoccupation with health problems, problems with poor judgment, passive, dependent style in relationships, and problems with insecurity, inadequacy, and a sense of inferiority. The testing also indicated that Brant was quick-tempered and may have had "some tendency to magnify or exaggerate his current difficulties." Dr. McClain further testified that at the time of their interview in October 2005, Brant was being prescribed Benadryl, Haldol, Pambalor, and Wellbutrin.

Dr. McClain testified that Brant stated that before the sexual battery and murder, he had consumed alcohol and had been "doing significant amounts" of crystal methamphetamine for approximately

eight days and ecstasy for two days. Brant also told Dr. McClain that he had not been sleeping well before the murder. Dr. McClain explained that in people such as Brant, who already have underlying anger problems, methamphetamine use is going to make them more likely to be "[i]mpulsive or to not be able to control their anger." Dr. McClain opined that due to Brant's deficits in brain functioning, Brant's capacity to conform his conduct to the requirements of law was substantially impaired on July 1, 2004.

After the defense rested, the State presented a witness to rebut witness McKinney's claim that she and Brant left college voluntarily. The State's witness established that Brant and McKinney may have been asked to leave the school for violating the school's policy against sexual activity among students. The State also presented a mental health expert and victim impact statements.

Specifically, Donald R. Taylor, Jr., M.D., an expert in forensic psychiatry, testified that in July 2004, Brant suffered from substance dependence disorder (primarily involving alcohol, cannabis, ecstasy, and methamphetamine), a learning disorder, and sexual sadism. Aside from rough sex with McKinney, Dr. Taylor was not aware of Brant acting violently prior to July 1, 2004. Dr. Taylor testified that during the first several days or weeks after arrest, Brant experienced symptoms of alcohol and drug withdrawal and that during the first several weeks or months, Brant experienced symptoms of anxiety or depression. Dr. Taylor stated that Brant was treated with psychotropic medications beginning after his arrest in July 2004 until May 2007. Dr. Taylor defined sexual sadism as a "type of sexual disorder in which somebody derives sexual arousal or pleasure from causing physical humiliation or suffering to a person that is not consenting to the sexual act." Dr. Taylor explained that in most cases, sexual sadism arises out of a genetic predisposition and unhealthy childhood environment. Dr. Taylor testified that Brant's childhood contained factors that can contribute to a diagnosis of sexual sadism.

Concerning the sexual battery, Dr. Taylor opined that Brant did have "a substantial impairment in his ability to conform his conduct with the requirements of the law" due to his sexual sadism and the influence of methamphetamine. Dr. Taylor explained that due to a sexual disorder, Brant had sexual impulses that were difficult for him to control and that this difficulty would have been exacerbated by the use of methamphetamine. With regard to the murder, in contrast, Dr. Taylor opined that Brant was not "substantially" impaired. He

explained that there was no "similar disorder that was causing [Brant] any type of uncontrollable or difficult to control urges to kill." Moreover, Dr. Taylor stated that Brant's actions of preventing the victim from leaving the duplex, putting on gloves, putting the body in the tub and turning on the water, and changing clothes before leaving were not consistent with substantial impairment. Still, Dr. Taylor testified that there was "some level of impairment related to being under the influence of methamphetamines" during the murder. Dr. Taylor summarized that Brant "did have a mental disorder, which in my opinion substantially impaired his ability to refrain from committing rape but that he did not have any similar corresponding mental disorder which . . . caused a similar type of impairment in his able [sic] to refrain from committing murder."

Id. at 1278-83.

The trial court concluded that two aggravating circumstances were proven beyond a reasonable doubt: (1) the murder was heinous, atrocious, or cruel (HAC) (great weight); and (2) the capital felony was committed while engaged in the commission of a sexual battery (great weight). The trial court also found that three statutory mitigating circumstances[1] and ten nonstatutory mitigating circumstances[2]

1. The three statutory mitigating circumstances specifically enumerated in section 921.141(6), Florida Statutes (2007), were: (1) Brant had no significant history of prior criminal activity (little weight); (2) Brant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (moderate weight); and (3) Brant was thirty-nine years old at time of the offense (little weight).

2. The ten nonstatutory mitigating circumstances were: (1) Brant is remorseful (little weight); (2) he cooperated with law enforcement officers, admitted the crimes, pleaded guilty, and waived a penalty-phase jury (moderate weight); (3) he has borderline verbal intelligence (little weight); (4) he has a family history of mental illness (little weight); (5) he is not a sociopath or psychopath and does not have antisocial personality disorder (little weight); (6) he has diminished

- 10 -

were established. Finding sufficient aggravating circumstances that were not outweighed by the mitigating circumstances, the trial court sentenced Brant to death for the murder, concurrent terms of life imprisonment for the sexual battery, kidnapping, and burglary, and five years' imprisonment for the grand theft. The sole issue raised on direct appeal was that the death sentence was disproportionate. We affirmed the convictions and sentences in 2009, concluding that Brant's death sentence was proportionate and that his guilty plea was knowingly, intelligently, and voluntarily made. Id. at 1288-89.

## II. POSTCONVICTION APPEAL

In 2011, Brant filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.851 raising, after several amendments, a total of seven claims.[3] An evidentiary hearing was held in 2013, during which Brant presented

---

impulse control and exhibits periods of psychosis due to methamphetamine abuse, recognized his drug dependence problem, sought help for his drug problem, and used methamphetamine before, during, and after the murder (moderate weight); (7) he has been diagnosed with chemical dependence and sexual obsessive disorder, and he has symptoms of attention deficit disorder (moderate weight); (8) he is a good father (little weight); (9) he is a good worker and craftsman (little weight); and (10) he has a reputation of being a nonviolent person (little weight).

3. The seven claims were: (1) ineffective assistance of counsel during the guilt phase; (2) ineffective assistance of counsel during the penalty phase; (3) counsel was ineffective for failing to prepare for jury selection; (4) counsel was ineffective for failing to present the testimony of a neuropharmacologist on the issue of the interrogation's effect on Brant; (5) cumulative ineffective assistance; (6) Brant will be incompetent at the time of execution; and (7) the State withheld

- 11 -

testimony from over forty lay and expert witnesses.  In 2014, the trial court issued an order denying relief.  This appeal follows.

## A.  Ineffective Assistance of Counsel During the Guilt Phase

In his first issue on appeal, Brant contends that trial counsel were ineffective for advising him to plead guilty without consulting a jury expert or researching jury decision-making, and without Brant receiving any benefit for his plea.  Brant claims that if trial counsel had consulted with a jury expert or researched jury decision-making, there is a reasonable probability that he would have insisted on going to trial.

Under Strickland v. Washington, 466 U.S. 668, 686-88 (1984), a defendant alleging that he received ineffective assistance of counsel has the burden to demonstrate that counsel's performance fell below an objective standard of reasonableness.  In order to prevail on a claim of ineffective assistance of counsel, a defendant must show both that trial counsel's performance was deficient and that the deficient performance prejudiced the defendant.  Strickland, 466 U.S. at 687.  "Both prongs of the Strickland test present mixed questions of law and fact." Johnson v. State, 135 So. 3d 1002, 1013 (Fla. 2014) (citing Sochor v. State, 883 So. 2d 766, 771 (Fla. 2004)).  "In reviewing a trial court's ruling after an

evidence that Brant's half-brother was a confidential informant in violation of Brady v. Maryland, 373 U.S. 83 (1963).  Claim 4 was later withdrawn by Brant.

evidentiary hearing on an ineffective assistance of counsel claim, this Court defers to the factual findings of the trial court to the extent that they are supported by competent, substantial evidence, but reviews de novo the application of the law to those facts." Id. (quoting Mungin v. State, 932 So. 2d 986, 998 (Fla. 2006)).

As to the first prong, the defendant must establish "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Generally, a court reviewing the second prong must determine whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.

Where an ineffective assistance claim involves a guilty plea, the Strickland standard is slightly modified. While the deficient performance prong remains the same, the United States Supreme Court held in Hill v. Lockhart, 474 U.S. 52, 59 (1985), that when a defendant challenges his guilty plea based on ineffective assistance of counsel, under the prejudice prong of Strickland, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." We have

previously applied the standard announced in Hill to claims of ineffective assistance of counsel in cases in which the defendants entered guilty pleas. E.g., Allred v. State, 186 So. 3d 530, 535 (Fla. 2016); Long v. State, 118 So. 3d 798, 803 (Fla. 2013); Barnhill v. State, 971 So. 2d 106, 111 (Fla. 2007); Grosvenor v. State, 874 So. 2d 1176, 1181-82 (Fla. 2004).

At the evidentiary hearing, guilt-phase counsel, Rick Terrana, testified that he practiced primarily criminal defense since 1991 and tried between fifteen and twenty-five capital cases. His strategy in this case was to attack Brant's confession. His strategy in moving to suppress the confession involved Brant's methamphetamine use and how it affected him and his ability to give a voluntary statement. To that extent, he researched methamphetamines, sought input from a former prosecutor, and solicited the assistance of various experts, including psychologists, a toxicologist, and a psychiatrist.

Terrana testified that he and penalty-phase counsel, Bob Fraser, discussed the prospect of a guilty plea with Brant after the motion to suppress the confession was denied. They felt that Brant's confession was very damaging and it would have a major impact on a jury, which would hear it at both the guilt phase and the penalty phase. Terrana believed that if Brant waived the guilt phase and did not contest his guilt, the jury might be more kindly disposed to the mitigating circumstances presented at the penalty phase. This belief was based on Terrana's

twenty-five years of experience, during which he handled many successful penalty phases and had many opportunities to make observations about how jurors decide cases.

When asked whether Brant ever indicated that he wanted to have a guilt-phase trial, Terrana responded: "No. From day one he was adamant on that. That's one thing he put his foot down on[.]" Terrana attempted to negotiate a life sentence in exchange for Brant's guilty plea, but the State would not agree.

Fraser testified at the evidentiary hearing that at the time he was appointed to represent Brant, he had been handling court-appointed cases for nearly twenty years and had tried approximately twenty-five first-degree murder cases, including some where the defendant was clearly guilty. Based on his experience and the strong evidence in this case, Fraser believed that by pleading guilty, Brant "would be less likely to incur the ire of the jury" during the penalty phase. Fraser testified that all of Brant's options were explained to him, and Brant ultimately elected to plead guilty. A letter Fraser wrote to Brant on November 13, 2006, memorializing a discussion that occurred earlier that day between counsel and Brant was introduced at the evidentiary hearing. In the letter, Fraser explained to Brant the negative aspects of pleading guilty, the right to testify, and the unavailability of a voluntary intoxication defense. Both Terrana and Fraser testified that the letter

accurately summarized the discussions they had with Brant in regard to pleading guilty.

Brant testified at the evidentiary hearing that he did not remember telling his attorneys that he wanted to plead guilty. He said that during the plea colloquy he was just doing what his attorneys told him to do.

Brant also presented a jury consultant, Toni Blake, at the evidentiary hearing. She testified that if she had been retained by trial counsel, she would have advised them that it would not be "bad" for a jury to be exposed to the troubling or disturbing aspects of Brant's confession during the guilt phase and then again during the penalty phase because a jury becomes "systematically desensitized" by repeated exposure to disturbing facts, meaning that the second time the jury heard Brant's confession, it would have been less shocking and had less of an emotional impact. Blake acknowledged that even if she had consulted with trial counsel and advised them that Brant should not plead guilty, they would not have been obligated to advise Brant in accordance with her advice and that the attorneys with whom she does consult do not always follow her advice.

In denying relief on this claim, the postconviction court credited counsel's testimony that "from day one" Brant did not want to proceed to a jury trial and that the decision to plead guilty was ultimately made by Brant. The court discredited Brant's testimony that he did not recall telling his attorneys that he wanted to plead

- 16 -

guilty. The postconviction court concluded that Brant failed to establish both deficient performance and prejudice. We agree.

"Judicial scrutiny of counsel's performance must be highly deferential" and should "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" Strickland, 466 U.S. at 689. "When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000).

The evidence presented at the evidentiary hearing established that trial counsel were seasoned criminal trial attorneys with experience handling both phases of capital trials. They were not constitutionally required to consult an outside expert in order to gauge a jury's likely reaction to Brant pleading not guilty to a crime of which he was clearly guilty. Their own expertise and experience in trying capital first-degree murder cases rendered them sufficiently qualified to advise Brant that a guilty plea would limit the jury's exposure to the damaging nature of his confession and may help him avoid the ire that a jury might hold if he tried to contest his guilt.

Counsel's decision to advise Brant to plead guilty was reasonable given that the original defense strategy to attack the confession was unsuccessful, the advice was given after alternatives were considered and rejected, and the State was

proceeding on theories of both premeditated and felony murder with very strong evidence. Moreover, counsel's advice and Brant's decision to follow that advice provided a benefit to Brant because the trial court considered his guilty plea to be a mitigating circumstance of moderate weight.

Brant also asserts that the postconviction court erred in failing to consider the American Bar Association Guidelines for the Appointment & Performance of Defense Counsel in Death Penalty Cases (ABA Guidelines) regarding the hiring of a jury consultant. The only reference to the hiring of a jury consultant in the ABA Guidelines is in the commentary to section 10.10.2—titled Voir Dire and Jury Selection—which states, "Given the intricacy of the process and the sheer amount of data to be managed [in voir dire and jury selection], counsel should consider obtaining the assistance of an expert jury consultant." The ABA Guidelines merely recommend that counsel consider consulting with a jury expert. Moreover, the ABA Guidelines are neither rules nor requirements, and the failure to comply with them is not necessarily deficient. See Mendoza v. State, 87 So. 3d 644, 653 (Fla. 2011) ("The ABA Guidelines are not a set of rules constitutionally mandated under the Sixth Amendment and that govern the Court's Strickland analysis."). Under the circumstances presented, we find no merit to the claim that counsel were deficient for failing to retain a jury consultant in compliance with the ABA Guidelines.

- 18 -

Brant also failed to establish that he was prejudiced by counsel's failure to conduct research on jury decision-making or consult with a jury selection expert. In order to establish prejudice, Brant was required to show that had counsel researched jury decision-making or consulted with a jury selection expert, there was a reasonable probability that he would not have pleaded guilty and would have insisted on going to trial.

> [I]n determining whether a reasonable probability exists that the defendant would have insisted on going to trial, a court should consider the totality of the circumstances surrounding the plea, including such factors as whether a particular defense was likely to succeed at trial[ and] the colloquy between the defendant and the trial court at the time of the plea . . . .

Grosvenor, 874 So. 2d at 1181-82. Brant has not suggested that there was any particular defense available to him that was likely to succeed at trial. In light of his confession, which was corroborated by the crime scene, the DNA evidence, and the presence of items taken from the victim's home in his trash, it does not appear that any defense would have been available to Brant and likely to succeed at trial.

The postconviction court found Terrana's testimony that "from day one" Brant did not want to have a guilt-phase jury trial more credible than Brant's testimony that he did not remember telling his attorneys that he wanted to plead guilty and he was just doing what his attorneys told him to do during the plea colloquy. This Court has stated that it will not substitute its judgment for that of the postconviction court as to the credibility of witnesses so long as the findings

- 19 -

are supported by competent, substantial evidence. See Long, 118 So. 3d at 804;

Lowe v. State, 2 So. 3d 21, 29-30 (Fla. 2008).

The postconviction court's finding as to Terrana's credibility was supported by the fact that within a few days of the murder, Brant attempted to turn himself in to law enforcement, confessed to the crimes, and requested the death penalty. The postconviction court's finding that Brant was not credible is supported by the fact that his plea colloquy contradicted his evidentiary hearing testimony. The plea colloquy between Brant and the trial court does not indicate that Brant had any hesitation regarding his plea. Instead, it demonstrates that the decision to plead guilty was Brant's alone, that he was fully aware of the consequences of his plea, and that he was satisfied with the representation provided by his attorneys. Additionally, we concluded on direct appeal "that Brant's plea was knowingly, intelligently, and voluntarily made." Brant, 21 So. 3d at 1288.

Brant has not established that counsel would have advised him not to plead guilty had they consulted with a jury selection expert or researched jury decision-making. Nor has he established, under the totality of the circumstances, that there is a reasonable probability that had he been advised not to plead guilty, he would have insisted on going to trial. We affirm the denial of relief as to this claim.

**B. Ineffective Assistance of Counsel During the Penalty Phase**

Brant alleges that trial counsel rendered ineffective assistance during the penalty phase by failing to: (1) learn and present evidence that Brant was conceived during a rape; (2) present a methamphetamine expert; (3) present a prison expert; (4) present images from Brant's PET scan and additional experts to describe the findings from the PET scan; and (5) conduct an adequate background and mental health investigation. Each alleged deficiency will be discussed in turn.

### 1. Brant's Conception

During the penalty phase in 2007—and in several other sworn statements—Brant's mother, Crystal Coleman, testified that her ex-husband, Eddie Brant, was Brant's biological father. When postconviction counsel first spoke with Crystal in 2009 or 2010, she still claimed that Eddie was Brant's father. Even after postconviction counsel confronted Crystal in late 2012 with the results of a DNA analysis that revealed that Brant and his sister, Sherry, were only half-siblings, Crystal continued to insist that Eddie was Brant's father. Eventually, in January 2013, Crystal finally admitted that Eddie was not Brant's father. During the postconviction proceedings, Crystal testified that Brant was actually conceived when she was raped by a neighbor while she was married to Eddie. When asked why she lied at the penalty phase, she responded that she did not want Brant or anyone else to know about the circumstances of his conception. Crystal testified

that she kept her secret about the rape long after Brant was convicted and sentenced to death.

In concluding that counsel was not deficient for failing to discover the circumstances of Brant's conception, the postconviction court noted that Eddie essentially had no contact with Brant after the age of seven weeks and that Eddie died approximately eight months after Brant's arrest. The postconviction court found that it was clear that Crystal kept the identity of Brant's biological father and the rape a secret from everyone except Eddie and a few distant relatives. Neither Brant, his half-sister, his half-brother, nor Crystal's best friend knew that Eddie was not Brant's father.

We agree with the postconviction court that Brant failed to show that counsel performed deficiently in failing to discover the circumstances of Brant's conception. Counsel had no reason to believe that Eddie was not Brant's father, and Crystal testified several times under oath that Eddie was Brant's father. Under these circumstances, counsel cannot be expected to verify paternity through other family members or DNA testing.

We also conclude that Brant was not prejudiced by trial counsel's failure to discover the circumstances of his conception. Brant does not allege that he was aware that he was conceived during a rape at the time he committed the murder, during the 2007 trial, or any time prior to the DNA analysis in 2012; therefore, any

mitigating value of the circumstances of his conception would be negligible at best. Cf. State v. Conaway, 453 S.E.2d 824, 854 (N.C. 1995) ("[T]he fact that defendant was conceived through a rape has no logical relationship to his moral culpability for these murders . . . . [T]here was no evidence that defendant even knew of the circumstances of his conception prior to the murders."). Brant's position is that the circumstances of his conception would have been "mitigating evidence of a disadvantaged or abusive childhood," but even without knowing about the rape, the trial court found as mitigating that Brant had an abusive childhood. See State v. Brant, No. 04-12631 (Fla. 13th Cir. Ct. Dec. 4, 2007) (Corrected Sentencing Order at 41) ("Defendant was emotionally, mentally, and physically abused by his stepfather from age 5 to 17[.]"). There is no reasonable probability that Brant would have received a life sentence had the circumstances of his conception been presented to the trial court.

## 2. Methamphetamine Expert

Brant next argues that trial counsel was deficient for failing to retain a methamphetamine expert to explain the effects of methamphetamine on Brant's brain. Brant alleges that trial counsel's decision "not to present a specialist expert on meth use cannot fairly be considered a reasonable strategic decision because Fraser never spoke to such an expert and therefore would not have been able to make a reasonably informed strategic decision whether to present such testimony."

In preparation for trial, both of the doctors hired by the defense to evaluate Brant were asked to address Brant's methamphetamine use as part of their evaluations. At the penalty phase, Dr. Maher testified that he diagnosed Brant as suffering from severe methamphetamine dependence associated with psychotic episodes and discussed the effects of methamphetamine on Brant's brain. Brant, 21 So. 3d at 1281. In the sentencing order, the trial court regarded Dr. Maher as "ha[ving] expertise in the behavior of persons who abuse methamphetamine."

Dr. McClain testified at the penalty phase that she diagnosed Brant with polysubstance dependence and that his use of methamphetamine leading up to the murder rendered him more impulsive or unable to control his anger, which resulted in his capacity to conform his conduct to the requirements of the law being substantially impaired at the time of the murder. Id. at 1282. At the evidentiary hearing, Dr. McClain testified that she considers addiction and the effects of methamphetamine use as an area of expertise for her.

Based on the testimony at the penalty phase regarding Brant's methamphetamine use, the trial court found one statutory mitigating circumstance and two nonstatutory mitigating circumstances—all of which were accorded moderate weight: (1) his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; (2) he has diminished impulse control and periods of psychosis due to methamphetamine

abuse, has recognized and sought help for his drug dependence problem, and used methamphetamine before, during, and after the murder; and (3) he has been diagnosed with chemical dependence. Id. at 1283. Despite the expert testimony presented at the penalty phase and the mitigating circumstances found by the trial court relating to his use of methamphetamine, Brant claims that counsel performed deficiently in failing to present this testimony through an expert who specializes in methamphetamine. Brant also claims that had counsel utilized an expert who specializes in methamphetamine, the trial court would have found the existence of the statutory mitigating circumstance of extreme emotional disturbance.

At the evidentiary hearing, Brant presented testimony from William Alexander Morton, Ph.D., an expert in psychopharmacology and addiction. Dr. Morton testified that because Brant's methamphetamine use was causing psychotic symptoms at the time of the murder, he would have testified at the penalty phase that Brant was under an extreme emotional disturbance. When asked to explain what he meant by "extreme emotional disturbance," Dr. Morton responded:

> I mean inability to think logically; to make decisions logically; to be extremely upset and engaging in something very impulsive that starts off this chain of events, at least leading to the rape of [the victim]. So mainly thinking of paranoid thoughts, of illogical thoughts. I asked him, "Were you hallucinating at that time?" He said, "No, I was not having hallucinations," but he . . . did report being suspicious and paranoid and agitated.

Finding that trial counsel did not perform deficiently, the postconviction court concluded that "[t]he postconviction testimony was essentially cumulative; the crux of Dr. Morton's testimony—that Defendant's methamphetamine use and abuse diminished his ability to control his impulses—was conveyed through Dr. Maher."

We agree with the postconviction court's conclusion that counsel did not render deficient performance in failing to present a "specialist expert on meth use." Trial counsel presented expert testimony regarding the extent of Brant's methamphetamine use, the effects of it, and the behavior of persons who abuse methamphetamine through Dr. Maher—who was deemed by the trial court to be an expert in that field—and Dr. McClain. As a result, the trial court found that multiple mitigating circumstances relating to Brant's methamphetamine use were established and gave those circumstances moderate weight. Testimony from a "specialist expert" on methamphetamine would have been mostly cumulative, and trial counsel is not ineffective for failing to present cumulative evidence. Darling v. State, 966 So. 2d 366, 378 (Fla. 2007). Although Dr. Morton would have testified that Brant's psychotic symptoms constituted an extreme emotional disturbance, we have repeatedly stated that trial counsel is not deficient because the defendant is able to find postconviction experts that reach different and more favorable conclusions than the experts consulted by trial counsel. E.g., Diaz v.

- 26 -

State, 132 So. 3d 93, 113 (Fla. 2013); Wyatt v. State, 78 So. 3d 512, 533 (Fla. 2011); Asay v. State, 769 So. 2d 974, 986 (Fla. 2000).

Brant also failed to establish prejudice because it is questionable whether Dr. Morton's testimony could have established the existence of the extreme emotional disturbance mitigating circumstance based on Brant's report of "being suspicious and paranoid and agitated." Dr. Morton found that Brant was not hallucinating at the time of the murder, but that he was suffering from an extreme emotional disturbance. On the other hand, Dr. Maher, who testified at the penalty phase that Brant was hallucinating at the time of the murder, did not find that Brant was suffering from an extreme emotional disturbance. Further, testimony at the penalty phase from Brant's former wife that he was able to interact pleasantly with her, wash dishes, clean up the kitchen, watch the evening news, and sleep in bed next to her the night he committed the murder would have refuted the allegation that he was under an extreme emotional disturbance. See Nelson v. State, 850 So. 2d 514, 530 (Fla. 2003) (concluding that there was competent, substantial evidence to refute allegation that defendant was under extreme mental or emotional disturbance where witnesses who encountered the defendant before and after murder testified he was acting normally). Thus, Brant has not shown that there is a reasonable probability that he would have received a life sentence had counsel

presented a different expert who would have opined that Brant was under an extreme emotional disturbance at the time of the murder.

### 3. Prison Adjustment Expert

Brant asserts that trial counsel was ineffective for failing to present testimony during the penalty phase from a prison adjustment expert regarding Brant's ability to adjust positively to a prison environment.

At the evidentiary hearing, Brant presented James Aiken, an expert in prison operations and classification of an inmate's adaptability to a prison setting. In preparation for the evidentiary hearing, Aiken reviewed materials provided by postconviction counsel, including the sentencing order and jail records, and interviewed Brant and correctional staff from the Hillsborough County Jail. Aiken testified that, in his opinion, Brant had the ability to "adjust very well [in the prison system] from the standpoint he can be housed in a high security facility for the remainder of his life without causing an unusual risk of harm to staff, inmates, or the public." Also at the evidentiary hearing, Brant presented Dr. Mark Cunningham, a clinical and forensic psychologist and expert in prison risk assessment, who opined that "there is very little likelihood that [Brant] would commit serious violence [if] confined for life in the Florida Department of Corrections." The postconviction court concluded that Brant failed to establish prejudice because in light of the aggravating circumstances that the murder was

HAC and committed during a sexual battery, there was no reasonable probability that Brant would have received a life sentence had positive prison adjustment testimony been presented at the penalty phase.

We agree that Brant is not entitled to relief. The positive prison adjustment testimony that Brant claims should have been presented is that Brant can be safely incarcerated for the rest of his life without presenting a risk of harm to staff or other inmates. Based on this testimony, Brant's argument would have essentially been that except for the murder and sexual battery in this case, he is generally a nonviolent person who would not be violent in a prison setting.

At the penalty phase, trial counsel presented testimony from two witnesses that Brant was a nonviolent person who did not have any problems getting along with others. Trial counsel also introduced into evidence Brant's records from the Hillsborough County Jail, which showed that Brant was a trustee at the jail despite being charged with capital murder and other violent offenses. As a result, the trial court found as mitigating circumstances that Brant "has a reputation of being a non-violent person" and until the murder "had led a crime-free life."

In light of the evidence presented at the penalty phase, we conclude that counsel did not perform deficiently in failing to present a prison adjustment expert. Evidence presented by counsel that Brant was a well-behaved prisoner—by virtue of his trustee status at the jail—got along well with others, and had a reputation for

being nonviolent was evidence of a positive ability to adjust to a prison environment. See Skipper v. South Carolina, 476 U.S. 1, 7 n.2 (1986) (noting that evidence suggesting that defendant had been a well-behaved and disciplined prisoner in jail was evidence of adjustability to life in prison). That counsel did not present this evidence through an expert witness does not render counsel's performance deficient.

Nor was Brant prejudiced by the lack of expert prison adjustment testimony. Specific testimony that Brant was generally a nonviolent person and a good prisoner who would likely be able to adapt to prison life without causing any further harm to anyone would have added little to the evidence that was presented. Brant has not demonstrated a reasonable probability that had such expert testimony been presented, he would have received a life sentence, especially in light of the HAC aggravating circumstance, which is "among the weightiest in Florida's death penalty scheme[,]" Martin v. State, 151 So. 3d 1184, 1198 (Fla. 2014). Our confidence in the outcome is not undermined.

### 4. Brain Damage and PET Scan Evidence

Next, Brant asserts that trial counsel was ineffective for failing to reasonably investigate and present evidence that he has brain damage. Specifically, Brant asserts that counsel was deficient in failing to present images from his PET scan at the penalty phase and in failing to identify and inform defense experts of his risk

factors for brain damage, i.e., head banging, ingestion of plaster and lead paint as a toddler, and a head injury in 2001.

After evaluating Brant, Dr. McClain recommended to trial counsel that Brant undergo a PET scan. Trial counsel retained Dr. Frank Wood, a clinical neuropsychologist and forensic psychologist, to conduct the PET scan and also consulted with Dr. Joseph Chong Sang Wu, an expert in brain imaging technology, regarding the results of the PET scan. Trial counsel ultimately decided not to have Drs. Wood or Wu testify at the penalty phase and to introduce the results of the PET scan through Dr. Maher instead.

Dr. Maher testified at the penalty phase that the PET scan showed four areas of suppressed glucose uptake that could indicate underactivity in those parts of the brain. Dr. Maher identified those areas of the brain as being important to impulse control and good judgment. While he could not identify the abnormalities as the cause of Brant's criminal acts, he did conclude that the PET scan was consistent with a diagnosis that includes a problem with impulse control. In reaching this conclusion, Dr. Maher relied, in part, on the depositions and reports of the other psychological and brain experts consulted in this case, including Drs. Wood, Wu, McClain, and the State's experts, Drs. Mayberg and Taylor. Dr. Maher testified at the evidentiary hearing that although he was not aware of Brant's childhood head

banging and ingestion of lead paint, or his 2001 head injury at the time of the penalty phase, those circumstances would have corroborated his findings.

Dr. McClain testified at the penalty phase that Brant suffered from a cognitive disorder and that there were areas of the brain with very significant impairment. Dr. McClain opined that due to Brant's brain damage or deficits in brain functioning, his capacity to conform his conduct to the requirements of law was substantially impaired when he committed the murder. Dr. McClain said that she consulted and reviewed the PET scan with Dr. Wu and reviewed the depositions of Drs. Wood and Wu, which confirmed that the PET scan was consistent with her neuropsychological data and that it showed abnormal brain function impairment in certain areas of his brain. Dr. McClain testified at the evidentiary hearing that she was aware of Brant's head-banging and ingestion of plaster at the time of trial.

Both Drs. Wood and Wu testified at the evidentiary hearing. Dr. Wood testified that Brant's PET scan revealed abnormalities in four areas of Brant's brain. He prepared a PowerPoint with images from the scan to accompany the testimony he planned to present at Brant's trial. He would have testified at the penalty phase that Brant had abnormalities indicative of "true disability in behavioral impulse control." Dr. Wood testified that he could not be 100% certain that Brant has brain damage, but he would estimate his certainty prior to Brant's

trial at 90%. With the addition of new information he learned during postconviction—that Brant ate plaster with lead-based paint, engaged in head banging as a child, had a head injury in 2001, and was not just an occasional but rather a heavy user of methamphetamine at the time of the murder—his certainty would increase to 93 or 94%. Dr. Wood could not say that any of these factors actually caused the brain damage. Dr. Wood defined the term brain "damage" as "damage, disease, or dysfunction," and stated that damage, disease, and dysfunction are all "abnormalities."

Dr. Wu testified that he was contacted in 2007 to provide a second opinion in regards to Brant's PET scan. He reviewed the PET scan and determined that Brant's brain was abnormal in three different regions, including a region which helps regulate violent, aggressive impulses. Dr. Wu was not aware at the time of Brant's penalty phase that Brant had a history of eating plaster and lead paint as a child, head banging as a child, a head injury in 2001, or the extent of his methamphetamine use, and he testified at the evidentiary hearing that "[a]ll of those items are certainly things that could have caused brain metabolic abnormalities," but that new information would not have changed the testimony he planned to give in 2007.

Brant also introduced hospital records related to his 2001 head injury at the evidentiary hearing. The records revealed that the injury was a two-centimeter

laceration that occurred when Brant hit his head on a metal door while climbing out of an elevator. The records also indicated that a CT scan was performed, which revealed no abnormal findings. Brant was discharged from the hospital on the day of the injury, less than three hours after he arrived.

Penalty-phase counsel Fraser testified at the evidentiary hearing that there were a number of reasons why he decided not to call Drs. Wood and Wu at the penalty phase, which he documented in a memo to his file, dated August 27, 2007, that was entered into evidence at the evidentiary hearing. In the memo, Fraser wrote:

> First, the opinion of Dr. Wood and a frank discussion on the limitations of the PET scan, both through Dr. Maher, established the bulk of what I intended to show through Doctors Wood and Wu. Dr. Maher testified that the PET scan could not link the underutilization of glucose in portions of the brain with behavior for any specific reason. It can only show glucose underutilization in regions of the brain normally associated with "executive" functions.

Fraser indicated that Dr. Wood agreed with his decision not to present the PET scan images during a conversation on August 24, 2007, to a greater extent than did Dr. Wu. Fraser was also concerned, after taking the deposition of the State's expert, Dr. Mayberg, that Dr. Mayberg would win in a credibility battle with Drs. Wood and Wu. In his August 27, 2007, memo, Fraser wrote that Dr. Wood "demonstrated a game-like approach to the use of PET evidence . . . his ego and gamesmanship obscure his message. . . . In addition, he tends to be long-winded

- 34 -

and oblique in his responses while speaking very slowly," which caused listeners "to drift away from him mentally." Fraser also indicated that he sometimes had difficulty communicating with Dr. Wu because of his accent, which left Fraser feeling that he lagged behind in their conversations because it took several seconds to process Dr. Wu's words.

Investigator Maloney also testified at the evidentiary hearing that she told Fraser that the defense attorneys in another capital case—in which she was involved at the same time she was involved in Brant's case—had concerns that the jury in that case was not receptive to Dr. Wu. Maloney shared that concern as she was watching that jury's reaction to Dr. Wu's testimony in that other case. She said the jurors had puzzled looks on their faces as Dr. Wu was testifying and "appeared to be struggling to grasp the content of what he was presenting." Maloney also had a hard time understanding Dr. Wu because English is not his first language and she heard other people in the courtroom ask each other, "What is he saying?"

The postconviction court found Fraser's testimony credible and concluded that Fraser's decision not to present the PET scan images or the testimony of Dr. Wood or Dr. Wu at the penalty phase was a reasonable strategic decision. The postconviction court found Fraser's strategy particularly advantageous to Brant

because the decision not to call Dr. Wu or Dr. Wood resulted in the State declining to call Dr. Mayberg to rebut the PET scan evidence.

The postconviction court did not err in denying this claim. Fraser's memo documenting his reasons for not presenting testimony from Drs. Wood and Wu provides competent, substantial evidence to support the postconviction court's credibility finding, and the record refutes Brant's claim that counsel was deficient for presenting the PET scan evidence only through Dr. Maher. We agree that after consulting with Drs. Wood, Wu, and Maher, and deposing Dr. Mayberg, Fraser made a reasonable, strategic decision to present the PET scan evidence only through Dr. Maher based on his concerns about the credibility of Drs. Wood and Wu and his belief that he could establish the mitigating circumstances he intended to establish through Dr. Maher.

As a result of the testimony from Drs. Maher and McClain at the penalty phase regarding Brant's brain abnormalities, the trial court found that Brant's capacity to appreciate the criminality of his conduct and his capacity to conform his conduct to the requirements of law were substantially impaired and that he had a diminished ability to control his impulses. Had Drs. Wood and Wu testified at the penalty phase, their testimony would have been that Brant had brain abnormalities that affected his ability to control his impulses and exercise good judgment, which would have been cumulative to the testimony that was offered.

Because counsel was able to establish the existence of the intended mitigating circumstances without presenting Drs. Wood and Wu or the actual images from the PET scan, there was no deficient performance even if Drs. Wood and Wu would have testified in more detail or presented the images. "As this Court has held, 'even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present cumulative evidence.' " Wheeler v. State, 124 So. 3d 865, 881 (Fla. 2013) (quoting Darling, 966 So. 2d at 377). We have also "consistently held that a trial counsel's decision to not call certain witnesses to testify at trial can be reasonable trial strategy." Everett v. State, 54 So. 3d 464, 474 (Fla. 2010). Because Fraser made a reasonable strategic decision in light of his concerns about the credibility and presentation of Drs. Wu and Wood, he did not render deficient performance. See Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000) ("[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct.").

Brant also failed to demonstrate that he was prejudiced by trial counsel's decision not to have Drs. Wood and Wu testify because the crux of their testimony would have been largely cumulative to that which was offered through Dr. Maher, and there is no reasonable probability that Brant would have received a life sentence had counsel presented the testimony of Drs. Wood and Wu or introduced

the PET scan images themselves. See Dufour v. State, 905 So. 2d 42, 61 (Fla. 2005) (holding that defendant failed to demonstrate prejudice where additional mitigating evidence did not substantially differ from that presented during the penalty phase); Atwater v. State, 788 So. 2d 223, 234 (Fla. 2001) ("There is no reasonable probability that re-presenting virtually the same evidence through other witnesses would have altered the outcome in any manner.").

Brant has also failed to show that counsel was deficient in failing to discover and inform the experts of Brant's history of eating plaster or lead paint, head banging as a child, head injury in 2001, and heavy meth use. Dr. Wood testified that such information would have only provided a negligible increase in his certainty that Brant had brain damage, but still would not have rendered him able to determine the cause of the damage. And although Dr. Wu testified that those factors could have caused Brant's brain metabolic abnormalities, he testified that it may be impossible to identify any of those factors as actual causes of the abnormalities. Both doctors testified that the testimony they gave at the evidentiary hearing would have been essentially the same testimony they would have given at the penalty phase, despite the new information they learned during the postconviction proceedings.

Furthermore, Dr. McClain testified at the evidentiary hearing that she was aware that Brant had been exposed to lead paint and had a history of head banging

as a child. Dr. Maher testified that even if he had been aware of the head banging, head injury, and lead paint ingestion at the time of the penalty phase, those circumstances would not have altered his conclusions. And both Drs. McClain and Maher were aware of the extent of Brant's meth use.

## 5. Background and Mental Health Investigation

Brant contends that trial counsel performed deficiently by failing to conduct a reasonable investigation into his childhood, family, and multi-generational background of addiction, abuse, neglect, and sexual exposure. In denying this claim, the postconviction court stated:

> [M]uch of the testimony and evidence presented during the instant postconviction proceedings is cumulative. For example, during the penalty phase, witnesses testified to the following: Defendant's maternal family history of mental health issues, alcohol abuse and physical violence, including [Brant's maternal grandfather]'s alcoholism and mental and physical abuse of [Brant's maternal grandmother] and the children, [Brant's maternal grandmother]'s history of depression for which she was medicated, Crystal's grandmother's hospitalization in a mental institution, and Crystal's own history of depression, hospitalization and psychotropic medications; Marvin's verbal and physical abuse of both Crystal and Defendant, and his sexual abuse of Sherry; Marvin's alcohol and substance abuse; Defendant's birth complications; Crystal's separation from and lack of bonding with Defendant; Defendant's history of attention deficit disorder; Defendant's substance abuse history and diagnoses of substance abuse or dependence; Defendant's use of methamphetamines at the time of the offenses and its effects, i.e., diminished impulse control; Defendant's brain abnormalities and difficulties with impulse control due to his brain deficits; Defendant's diagnoses of a sexual disorder and the genetic and environmental (factors over which Defendant had no control) link associated with sexual disorders; Defendant's own diagnosis and history of

depression; Defendant was remorseful; and that Defendant's capacity to conform his conduct to the requirements of law was substantially impaired. Consequently, the Court further finds Defendant has failed to establish that counsel performed deficiently.

With respect to the investigation and presentation of mitigation evidence, the United States Supreme Court observed that "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case." Wiggins v. Smith, 539 U.S. 510, 533 (2003). "In reviewing a claim that counsel's representation was ineffective based on a failure to investigate or present mitigating evidence, the Court requires the defendant to demonstrate that the deficient performance deprived the defendant of a reliable penalty phase proceeding." Whitton v. State, 161 So. 3d 314, 332 (Fla. 2014) (quoting Simmons v. State, 105 So. 3d 475, 503 (Fla. 2012)).

Most of Brant's claims regarding the deficiencies of trial counsel's investigation are refuted by the record. The record reflects that counsel did conduct a reasonable investigation into Brant's childhood, family, and multi-generational background of addiction, abuse, neglect, and sexual exposure. Counsel presented testimony at the penalty phase regarding Brant's grandparents and great-grandmother and their problems with regard to mental health, substance abuse, domestic violence, and low intelligence. The trial court took notice of this

- 40 -

testimony and as one of the mitigating circumstances found that Brant had a family history of mental illness. The record also reveals that trial counsel did investigate and present at the penalty phase the circumstances of Brant's life in utero and during his childhood, including the abuse and neglect he suffered and the sexual abuse he witnessed. Counsel presented testimony from family members, friends, peers, a professional associate, and spiritual advisors. Counsel presented academic records and a plethora of information regarding Brant's struggles with substance abuse.

We agree with the trial court's conclusion that Brant failed to establish that counsel rendered deficient performance in investigating Brant's background. The evidence presented to the postconviction court demonstrated that trial counsel conducted a reasonable mitigation investigation. See Stewart v. State, 37 So. 3d 243, 258 (Fla. 2010) (holding that the defendant did not show deficiency or prejudice where "the mental health experts and lay witnesses who testified during the penalty phase conveyed the substance, though perhaps not all of the details, of the proposed mitigating circumstances to the penalty phase jury"). And our confidence in the outcome is not undermined by the few pieces of noncumulative evidence presented at the evidentiary hearing.

**6. Jury Waiver**

After entering his guilty plea, Brant attempted to seat a penalty-phase jury on August 21, 2007, which was described as follows by trial counsel at the evidentiary hearing:

> We had a panel that was just—I mean, it was a debacle. It was just a debacle. We had jurors standing up. And I don't recall if I was questioning or Fraser was questioning, but when the issue came up and they found out that he had plead [sic] guilty and we were there just for the penalty phase, the overwhelming response to the point of almost, it looked like a riot was about to take place. These jurors were standing up saying why are we wasting our time here. He's guilty. Let's fry him. One would say that and four would follow behind, yeah, I agree. Yeah, I agree. Right. He's guilty. Let's fry him. And it was that type of thing. I mean, it just turned into a real fiasco altogether. Judge Fuente struck the entire panel.

After the jury panel was struck on August 21, 2007, trial counsel discussed with Brant the possibility of waving a jury recommendation at the penalty phase; at the time, Brant elected to proceed with another attempt to seat a penalty-phase jury from a different venire the next day. But by the following morning, Brant had changed his mind and decided to waive a jury recommendation. When Brant advised the trial court of his decision to waive a penalty-phase jury on August 22, 2007, the trial court conducted a thorough colloquy regarding the decision, during which Brant indicated that it was his decision alone, not his lawyers' decision, and that he was "absolutely sure" that he wanted to proceed without a jury. Brant now contends that trial counsel rendered deficient performance by either advising him to or failing to advise him not to waive a penalty-phase jury.

The evidence presented at the evidentiary hearing revealed that Terrana and Fraser had a long discussion with Brant during which they laid out all the pros and cons of waiving a jury recommendation, but neither of them advised Brant to do so. The postconviction court found the testimony of both attorneys credible and concluded that there was no deficient performance.

The postconviction court's findings are supported by competent, substantial evidence in the record, including the November 13, 2006, letter and the trial transcripts from August 21-22, 2007. Trial counsel did not perform deficiently by explaining all of Brant's options to him, including the positives and the negatives of those options, and then allowing Brant to make the decision on his own.

Under this claim, Brant also contends that counsel's performance fell below prevailing norms in: (1) "failing to develop rapport and trust with a client they knew suffered from depression"; (2) "failing to investigate and advise Brant of mitigation as set out above"; and (3) "failing to consult an expert on jury selection, having previously advised Brant to plead guilty." We reject these claims. Brant's assertion that there was no "rapport" or "trust" between Brant and his attorneys is refuted by the record. Brant told the trial court under oath during the plea colloquy that he was satisfied with the advice and representation he received from them both. The other two claims are without merit; counsel conducted a reasonable

mitigation investigation and did not perform deficiently in failing to consult with a jury selection expert.

## C.  <u>Brady</u> Violation

Brant next asserts that the postconviction court erred in denying his claim that the State withheld evidence that his half-brother, Garett Coleman, was a confidential informant ("CI") at the time of Brant's arrest, contrary to the mandates of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  In <u>Brady</u>, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  In order to show that the evidence is material and establish that a <u>Brady</u> violation occurred, the defendant must demonstrate that there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed.  <u>Strickler v. Greene</u>, 527 U.S. 263, 280 (1999).  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  <u>Id.</u> at 289-90.

While Brant's charges were pending, Garett was interviewed by the State and listed as a witness.  The State provided Garett's statements in discovery, and he was deposed by the defense.  Garett did not appear to testify at the penalty

- 44 -

phase, but two of his sworn statements were introduced at the <u>Spencer</u>[4] hearing by stipulation of the parties. The State suggested that the statements rebutted mitigation evidence about Marvin Coleman's attitudes and behaviors. The trial court did not agree that the statements rebutted any mitigation evidence but did find that they corroborated evidence of Marvin's demeanor and considered them as mitigation evidence.

At the evidentiary hearing, Garett testified that after Brant unsuccessfully attempted to turn himself in on July 3, 2004, Garett saw some deputies from the Orange County Sheriff's Office at a gas station and advised them of the situation and Brant's location. He told them to call Agent Neil Clarke, with whom Garett worked as a CI, to verify his credibility. Agent Clarke testified that he met Garett in November or December 2005, and that Garett became a CI in January 2006. Sheriff's office records introduced through Agent Clarke corroborated his testimony that Garett first became a CI in 2006.

The postconviction court found Agent Clarke's testimony and the sheriff's office records, indicating that Garett did not become a CI until 2006, more credible than Garett's assertion that he was a CI in 2004. Thus, the postconviction court denied relief because Brant failed to establish that Garett was a CI at the time of

_____

4. <u>Spencer v. State</u>, 615 So. 2d 688 (Fla. 1993).

- 45 -

Brant's arrest in July 2004. The court also concluded that even if Garett were a CI at the time he informed law enforcement of Brant's location in July 2004, he did so entirely of his own accord, there was no evidence that he was acting as a state agent at the time, and he did so because Brant wanted to turn himself in. Finally, even assuming that Garett was a CI in 2004 and provided information that led to Brant's arrest and the State withheld that information, the postconviction court concluded that Brant still would not be entitled to relief because such information was not material in that there was no reasonable probability that the result of the proceeding would have been different if the State had not withheld such information.

On appeal, Brant does not contest the postconviction court's finding that Garett was not a CI in 2004, nor does he explain how Garett's CI status would have been exculpatory, impeaching, or mitigating. Brant makes only the conclusory argument that Garett's CI status "was material as a mitigating factor under the Eighth Amendment and that the State's failure to disclose Garett's status as a CI violated Brant's Fifth, Sixth, Eighth and Fourteenth Amendment rights under the Federal Constitution."

The postconviction court did not err in denying this claim. The testimony of Agent Clarke and the sheriff's office records provide competent, substantial evidence supporting the postconviction court's finding that Garett was not a CI in

July 2004.  Further, Garett testified at the evidentiary hearing that he had conversations with Brant about being a CI prior to Brant's arrest, and that Brant advised him that it was not safe or a good idea to continue being a CI.  "If the evidence in question was known to the defense, it cannot constitute <u>Brady</u> material."  <u>Pagan v. State</u>, 29 So. 3d 938, 948 (Fla. 2009).  Thus, even if Garett had been a CI in 2004, and even if that information would have been favorable and material, a <u>Brady</u> claim cannot stand because Brant knew of the evidence that he alleged was withheld.

### III.  PETITION FOR A WRIT OF HABEAS CORPUS

In his petition for a writ of habeas corpus, Brant asserts that appellate counsel was ineffective for failing to raise on appeal: (1) the argument that this Court's proportionality review fails to consider cases in which the defendant was convicted of murder and sexual battery where the State either did not seek death or where the jury recommended a life sentence, and this Court's proportionality review violates Brant's right to equal protection; and (2) that the trial court erred in denying Brant's motion to dismiss the kidnapping count.

### A.  Ineffective Assistance of Appellate Counsel for Failure to Challenge the Constitutionality of Our Proportionality Review

Brant argues that appellate counsel was ineffective in failing to argue on appeal that this Court's proportionality review fails to consider "first-degree murder/rape" cases in which defendants were convicted but spared the death

penalty—due to either the State's decision not to seek the death penalty or because the jury recommended a life sentence—and therefore, Brant's death sentence is random, arbitrary, and capricious in violation of the Eighth Amendment. This argument is without merit.

Proportionality review is a unique function of this Court's review in capital cases, and is done for the purpose of fostering uniformity in death-penalty law. Tillman v. State, 591 So. 2d 167, 169 (Fla. 1991). It involves consideration of the totality of the circumstances of a case and a comparison of that case to other capital cases. Yacob v. State, 136 So. 3d 539, 546-47 (Fla. 2014); Snipes v. State, 733 So. 2d 1000, 1007 (Fla. 1999). It does not include a comparison of the circumstances of capital cases with those of noncapital cases. Indeed, we have specifically rejected the argument that our proportionality review is legally insufficient because we only consider cases in which a death sentence was imposed. See Hunter v. State, 8 So. 3d 1052, 1072-73 (Fla. 2008). Appellate counsel is not ineffective for failing to raise a meritless issue. Evans v. State, 995 So. 2d 933, 954 (Fla. 2008).

**B. Ineffective Assistance of Appellate Counsel for Failure to Challenge Denial of Motion to Dismiss Kidnapping**

Brant was charged in count three of the indictment with kidnapping by forcibly, secretly, or by threat, confining, abducting, or imprisoning the victim with the intent to inflict bodily harm or terrorize the victim, in violation of section 787.01(1)(a)3., Florida Statutes (2004). He filed a motion to dismiss count three

under Florida Rule of Criminal Procedure 3.190(c)(4), asserting that under Carron v. State, 414 So. 2d 288, 290 (Fla. 2d DCA 1982), approved, 427 So. 2d 192 (Fla. 1983), and Florida Standard Jury Instruction (Criminal) 9.1, as it existed from 1985 until 2014, see The Florida Bar re: Standard Jury Instructions Criminal Cases, 477 So. 2d 985, 997 (Fla. 1985), the State was required to prove that the confinement, abduction, imprisonment (a) must not be slight, inconsequential, or merely incidental to the felony; (b) must not be of the kind inherent in the nature of the felony; and (c) must have some significance independent of the felony in that it makes the felony substantially easier of commission or substantially lessens the risk of detention. The trial court denied the motion on the authority of our decision in Bedford v. State, 589 So. 2d 245, 251 (Fla. 1991). Brant now claims that appellate counsel was ineffective for failing to appeal the denial of his motion.

In Bedford, we held that the State is required to prove the three aforementioned elements when the kidnapping is charged as kidnapping with the intent to commit or facilitate the commission of another felony under subsection 787.01(1)(a)2., but not where the kidnapping is charged as kidnapping with the intent to inflict bodily harm upon or to terrorize under section 787.01(1)(a)3. 589 So. 2d at 251. Thus, a claim on appeal that the motion to dismiss was improperly denied would have been meritless, and appellate counsel was not ineffective for failing to raise a meritless claim. See Evans, 995 So. 2d at 954.

- 49 -

## IV. __HURST__

While Brant's postconviction appeal was pending before this Court, the United States Supreme Court issued its decision in Hurst v. Florida, 136 S. Ct. 616, 619 (2016), in which it held that "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death."  Brant, who waived his right to a penalty-phase jury, requested leave to file supplemental briefing to address the impact of Hurst on his sentence, which we granted.  We have previously held in a direct appeal that a defendant who has waived the right to a penalty-phase jury is not entitled to relief under Hurst.  See Mullens v. State, 2016 WL 3348429, at *20 (Fla. June 16, 2016) (concluding that defendant who waived penalty-phase jury was not entitled to relief under Hurst because a defendant "cannot subvert the right to jury factfinding by waiving that right and then suggesting that a subsequent development in the law has fundamentally undermined his sentence").  A similar claim in postconviction proceedings is necessarily precluded.  Accordingly, we reject Brant's Hurst claim.

## V.  CONCLUSION

For the reasons stated above, we affirm the postconviction court's order denying Brant's motion for postconviction relief and deny the petition for a writ of habeas corpus.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

Two Cases:

An Appeal from the Circuit Court in and for Hillsborough County,
	Deborah Michelle Sisco, Judge - Case No. 292004CF012631000AHC
And an Original Proceeding – Habeas Corpus

Marie-Louise Samuels Parmer of The Samuels Parmer Law Firm, P.A., Tampa, Florida,

	for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Christina Zuccaro, Assistant Attorney General, Tampa, Florida,

	for Appellee/Respondent